# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1156

_____

| | | |
|---|---|---|
| Roy L. McGreevy; Daktronics Aust/NZ, Ltd.; International Sign Displays Co., | * * * * | |
| Appellants, | * * | Appeal from the United States District Court for the |
| v. | * * | District of South Dakota. |
| Daktronics, Inc., | * * | |
| Appellee. | * | |

_____

Submitted: June 12, 1998
Filed: September 18, 1998

_____

Before BOWMAN, Chief Judge, LOKEN, Circuit Judge, and MAGNUSON,[1] District Judge.

_____

BOWMAN, Chief Judge.

Roy McGreevy, a citizen of New Zealand, sued Daktronics, Inc., a corporate citizen of South Dakota, in this diversity action for breach of contract, intentional infliction of emotional distress, and tortious interference with business relationships.

_____

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

The District Court[2] granted summary judgment for Daktronics on McGreevy's intentional infliction of emotional distress claim, a ruling from which McGreevy does not appeal. The District Court granted judgment as a matter of law (JAML) for Daktronics at the close of McGreevy's evidence on his tortious interference claim and denied his motion to submit a claim for punitive damages to the jury. The District Court submitted McGreevy's breach of contract claim to the jury, which awarded McGreevy money for certain royalties and commissions owed by Daktronics, but concluded that Daktronics had not otherwise breached any contract with McGreevy. McGreevy appeals from the grant of JAML on his tortious interference claim and from the denial of his motion to submit a claim for punitive damages to the jury. We affirm.

## I.

In 1987, McGreevy assigned his patent rights for the GlowCube pixel (a product used in commercial signage) to Daktronics, in return for which Daktronics granted "an exclusive marketing right, not to exceed nine (9) years, for products sold in New Zealand and Australia." Contract between McGreevy and Daktronics (Sept. 1, 1987). "Product" was defined under the agreement as "the GlowCube display elements and associated electronic circuitry." Id.

In 1989, McGreevy and Daktronics entered into a "PLAN FOR THREE (3) YEAR CONTRACT," a separately negotiated sales agreement as contemplated by the 1987 contract, with a duration from September 1, 1989, through August 31, 1992," with rights of renewal for further three (3) year periods." Contract between McGreevy and Daktronics (Aug. 24, 1989). McGreevy testified that he believed this contract vested renewal rights exclusively with him, whereas Daktronics interpreted this contract to convey renewal rights to both parties. This three-year agreement also called

---

[2]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

for McGreevy to receive a five percent commission on those sales in New Zealand and Australia whether or not Daktronics was involved. See id. McGreevy thereafter started a business in New Zealand to market Daktronics products utilizing the GlowCube pixel. McGreevy attempted to recruit dealers and sub-dealers to market and sell Daktronics products in New Zealand and Australia, but was disappointed with his lack of success. See, e.g., Facsimile from McGreevy to Daktronics (Aug. 26, 1992); Facsimile from McGreevy to Daktronics (Oct. 12, 1992).

In March 1993, Krone (Australia) Technique Party Ltd (Krone) approached Daktronics about joining forces to provide scoreboards for new athletic facilities being constructed in Sydney, Australia, in anticipation of the city's bid for the year 2000 Olympics. McGreevy had neglected to inform Daktronics of the possibilities this project presented for placement of Daktronics products. By the time Daktronics learned of this business opportunity, the entity in charge of the Sydney 2000 Olympics project had established and released a list of preferred bidders--a list from which McGreevy and his distributors were excluded. Moreover, the specifications released for the project designated the product of a Daktronics competitor. After being approached by Krone, Daktronics sent an engineer to Australia in an attempt to get Daktronics products specified for the project. McGreevy, learning of the attempts by Daktronics and Krone to bid on the project, agreed in a letter dated April 15, 1993, to accept a five percent commission if Daktronics was successful in getting its products used in the Sydney 2000 Olympics project. See Facsimile from McGreevy to Daktronics (Apr. 15, 1993) ("We are of course disappointed that we are not Tendering with Daktronics Inc both from a credibility and financial point of view. We will therefore have to accept the 5% commission if the project is successful."). Daktronics, working with Krone, ultimately was successful in selling its product to the Sydney 2000 Olympics project. McGreevy confirmed in writing on two subsequent occasions his agreement to accept a five percent commission on this sale.

On April 22, 1993, McGreevy entered into a contract with GlowTronics Advertising, Ltd. (a company not yet formed when the contract was signed), assigning to GlowTronics the marketing rights acquired under his contracts with Daktronics.  See Agreement between McGreevy and David Alexander Curlett (Apr. 22, 1993).  Also in April 1993, McGreevy was negotiating with Signopsys New Zealand, Ltd., for a similar assignment of marketing rights.

In August 1993, McGreevy provided Daktronics with a copy of his April 22, 1993, contract with GlowTronics.  McGreevy requested a "letter of comfort" from Daktronics, designed to assure GlowTronics that McGreevy held the marketing rights he previously had assigned to GlowTronics.  See Letter from McGreevy to Daktronics (Dec. 1, 1993).  Daktronics eventually provided the letter of comfort on December 8, 1993, although GlowTronics and McGreevy continued to perform under their agreement in the interim.

In May 1994, McGreevy entered into negotiations with Signopsys to sell all or a portion of his business.  After borrowing $50,000.00 from Bruce Thomson, the owner of Signopsys, McGreevy embarked on an extended vacation without informing Daktronics or Signopsys of his plans or the date of his anticipated return.  During this period, Signopsys approached Daktronics about conducting business directly.  Daktronics declined this offer and attempted, unsuccessfully, to contact McGreevy.  Upon his return to New Zealand, McGreevy entered into an agreement with Signopsys on July 29, 1994, wherein he sold his Daktronics marketing rights and the benefits of the GlowTronics contract in exchange for $95,000.00 and a stream of income from future sales.  See Purchase Agreement ¶¶ 1, 2 (July 29, 1994).

On August 19, 1994, McGreevy and Signopsys informed Daktronics that Signopsys had "taken over the benefits of [McGreevy's] marketing rights" and "the benefits of the marketing agreement . . . between [McGreevy] and GLOWTRONIC

ADVERTISING LTD."  Letter from Signopsys and McGreevy to Daktronics (Aug. 19, 1994).

McGreevy filed his initial complaint on October 15, 1996, stating only breach of contract claims against Daktronics for failing to honor his exclusive marketing rights in New Zealand and Australia, but later amended the complaint to include claims for tortious interference with business relationships, intentional infliction of emotional distress, and punitive damages.

## II.

McGreevy first argues that the District Court erred in granting Daktronics JAML on his tortious interference claim.  Rule 50(a)(1) of the Federal Rules of Civil Procedure allows the district court to enter JAML when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." McGreevy maintains that he provided sufficient evidence from which the jury could have concluded that Daktronics engaged in improper actions that amounted to tortious interference with his business relationships.  We review a district court's decision to grant JAML de novo, applying the same standards as those used by the district court.  See Fought v. Hayes Wheels Int'l, Inc., 101 F.3d 1275, 1277 (8th Cir. 1996).  We affirm where, viewing the evidence in the light most favorable to the nonmoving party and granting that party the benefit of all reasonable inferences, "the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict."  Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (quoting Caudill v. Farmland Indus., Inc., 919 F.2d 83, 86 (8th Cir. 1990)).  While we must give McGreevy the benefit of all reasonable inferences, he is not entitled to the benefit of unreasonable inferences or those in conflict with the uncontested facts.  See id.  "A reasonable inference is one 'which may be drawn from the evidence without resort to speculation.'  When the record contains no proof beyond speculation to support the verdict, judgment as a matter of law is

appropriate." Id. (quoting Hauser v. Equifax, Inc., 602 F.2d 811, 814 (8th Cir. 1979)) (citation omitted).

A number of McGreevy's arguments amount to contentions that Daktronics interfered with McGreevy's own agreement with Daktronics. We note from the outset that, under South Dakota law,[3] "'[o]ne contracting party does not have a cause of action against the other for conspiring to breach their [own] contract or for wrongfully interfering with its own contract.'" Landstrom v. Shaver, 561 N.W.2d 1, 17 (S.D. 1997) (quoting DP Serv., Inc. v. AM Int'l, 508 F. Supp. 162, 168 (N.D. Ill. 1981)) (first alteration made by this Court, second alteration made by Court in Landstrom). On the contrary, "when a contracting party does not act in good faith under the contract, the other party has a remedy under the contract for breach thereof but no independent tort cause of action exists for the same claim." Fisher Sand & Gravel Co. v. State by and through S.D. Dep't of Transp., 558 N.W.2d 864, 868 (S.D. 1997).

In order to prevail, therefore, McGreevy must prove the following essential elements of a tortious interference with business relationships claim:

1. the existence of a valid business relationship or expectancy;
2. knowledge by the interferer of the relationship or expectancy;
3. an intentional and unjustified act of interference on the part of the interferer;
4. proof that the interference caused the harm sustained; and,
5. damage to the party whose relationship or expectancy was disrupted.

Landstrom, 561 N.W.2d at 16 (quoting Tibke v. McDougall, 479 N.W.2d 898, 908 (S.D. 1992)). The District Court, in granting JAML on the tortious interference claim, found that McGreevy's evidence failed to establish an intentional and unjustified act of

---

[3]The parties agree that the substantive law of South Dakota governs the contested issues.

interference by Daktronics or to establish that damages occurred as a result of the alleged interference by Daktronics. We agree with the District Court that, even after viewing McGreevy's evidence in the most favorable light, McGreevy has failed to establish the necessary elements to prevail on a tortious interference claim. While McGreevy complains that certain actions taken by Daktronics over the course of their relationship amount to tortious interference, we reject McGreevy's contentions and limit our discussion to address only his strongest arguments.

McGreevy most strenuously contends that Daktronics interfered with his business relationships by bidding, in conjunction with Krone, on the Sidney 2000 Olympics project. Taking into account each essential element of a tortious interference claim, we conclude that McGreevy has failed to establish that any activity engaged in by Daktronics constitutes tortious interference. To satisfy the first element of a tortious interference claim, there must be "a 'reasonable probability' that [McGreevy] would have entered into a contractual relationship with a third party but for [Daktronics's] actions." Id. McGreevy has failed to show a "reasonable probability" that, but for Daktronics's alleged interference, he would have secured a contractual commitment concerning the Sidney 2000 Olympics project. Neither McGreevy nor any of his distributors were among the ten entities approved to bid on the project. In fact, until Daktronics and Krone became involved, the specifications released for the project designated the product of a Daktronics competitor. From this evidence, McGreevy cannot demonstrate that there was a reasonable probability that he would have succeeded in entering into a contractual agreement concerning the Sydney 2000 Olympics project.

Nor can Daktronics be charged with knowledge of a business relationship or expectancy between McGreevy and the Sydney 2000 Olympics project--the second essential element of a tortious interference claim--that did not exist. Because there was no reasonable probability that any such expectancy or relationship would come to fruition, by definition, the relationship or expectancy did not exist under South Dakota

-7-

law.  Daktronics cannot be charged with knowledge of something that is nonexistent. Daktronics knew only that the bidding process on the project was underway, that the list of approved bidders did not include McGreevy or any of his distributors, and that Daktronics products were not specified.  This knowledge is insufficient to satisfy the second element of a tortious interference claim.

Finally McGreevy has failed to satisfy the fourth and fifth elements of a tortious interference claim--that the interference caused the harm sustained and that damages ensued.  McGreevy offered no evidence that, as a result of Daktronics's involvement in the Sydney 2000 Olympics project, he suffered an injury that resulted in damages.  In fact, the evidence showed that McGreevy acquiesced in the Daktronics/Krone bid on the Sydney 2000 Olympics project, accepting in writing on three separate occasions (and eventually receiving) a five percent commission on the sale in lieu of direct involvement in the transaction.

McGreevy next argues that Daktronics interfered with his business relationship with GlowTronics, to whom he assigned a portion of his marketing rights in April 1993, by failing to provide in a timely manner a "letter of comfort" assuring GlowTronics that McGreevy indeed held the exclusive marketing rights to Daktronics products that he purported to possess.  The letter of comfort was requested in August 1993 and eventually provided by Daktronics in December 1993.  Despite the delay in complying with McGreevy's request, the evidence, including a letter written by McGreevy himself on another matter, indicates that GlowTronics had been performing satisfactorily without the letter of comfort.  See Facsimile from McGreevy to Signopsys (Aug. 18, 1995) ("GlowTronics have had every concern etc dealt with expediently whenever it arose."). Furthermore, Daktronics notes that the delay in providing the requested letter was due to McGreevy's attempt to sell marketing rights to GlowTronics through October 2002, when McGreevy possessed these rights only through August 1996.  The evidence presented by McGreevy falls short of permitting a factfinder reasonably to infer an intentional and unjustified act of interference by Daktronics and the necessary

harm suffered and damages sustained as a consequence of Daktronics's improper actions.[4]

Lastly, McGreevy contends that Daktronics tortiously interfered with his business relationships with Signopsys. In June and July of 1994, during negotiations between Signopsys and McGreevy for the sale of certain marketing rights, Signopsys initiated contact with Daktronics by sending two letters urging Daktronics to conduct business directly with Signopsys, noting Signopsys's difficulty in reaching an agreement with McGreevy. In response, Daktronics hesitated, writing to Signopsys of its attempts to reach McGreevy (who was on an extended and unforeseen leave of absence) in an effort to resolve the situation. Nothing in these two communications amounts to an intentional and unjustified act of interference by Daktronics. In fact, despite being approached by Signopsys and offered an opportunity to deal directly, Daktronics declined to interfere with McGreevy's reasonable expectation of doing business with Signopsys.

McGreevy eventually negotiated and entered into an agreement with Signopsys in July 1994, selling certain marketing rights for $95,000.00 and a stream of income from future sales. In August 1994, not knowing that an agreement between McGreevy and Signopsys had been reached, Daktronics sent two letters to McGreevy concerning the validity of their second sales agreement and the assignability of the marketing rights involved in that agreement. McGreevy contends that these two letters interfered with his dealings with Signopsys. McGreevy cannot, however, establish that these, or any

---

[4]McGreevy eventually terminated his agreement with GlowTronics. Prior to this termination, GlowTronics wrote to Daktronics that the "squabbling between Roy McGeevy [sic] and Bruce Thompson [sic] [of Signopsys] has been frustrating and confusing with each party making different claims, leaving us the meat between the sandwich." Letter from GlowTronics to Daktronics (Oct. 25, 1994). It is apparent from this evidence that Daktronics was not responsible for the termination of the agreement between McGreevy and GlowTronics.

other, communications by Daktronics caused him to suffer damages. The letters from Daktronics were not sent until August 1994, after McGreevy had completed the negotiations and purchase agreement with Signopsys. The August 1994 letters from Daktronics did not affect this transaction.

We agree with the District Court that McGreevy failed to establish a submissible case that Daktronics tortiously interfered with his business prospects. Consequently, we affirm the District Court's grant of JAML on McGreevy's tortious interference with business relationships claim.

## III.

Because McGreevy has failed to establish that Daktronics tortiously interfered with his business relationships, he is not entitled to recover punitive damages under South Dakota law. In general, claims for punitive damages are prohibited, unless expressly authorized by statute. See S.D. Codified Laws § 21-1-4 (Michie 1987); Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991). Recovery of punitive damages is not permissible in breach of contract actions. See id. § 21-3-2 ("In any action for the breach of an obligation not arising from contract, . . . the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant" where certain conduct is shown); see also Thu v. American Family Ins. Co., 292 N.W.2d 109, 110 (S.D. 1980). Because we have concluded that McGreevy failed to establish the essential elements of the tortious interference claim on which he bases his claim for punitive damages, he was not entitled to present the issue of punitive damages to the jury. The District Court did not err in refusing to allow McGreevy to submit this claim to the jury.

## IV.

We affirm the judgment of the District Court.

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.