LeRoy BAHR, Appellant,

v.

BOISE CASCADE CORPORATION
a/k/a Boise Paper Cascade Corporation, et al., Respondents.

No. A07–1353.

Supreme Court of Minnesota.

June 25, 2009.

Mitchell J. Brunfelt, Colosimo, Patchin, Kearny & Brunfelt, Ltd., Virginia, MN, for appellant.

John Harper III and Benjamin J. Court, Krass Monroe, P.A., Bloomington, MN, for respondents.

## OPINION

GILDEA, Justice.

This action arises from a workplace dispute between appellant LeRoy Bahr and respondent Stacy Rasmussen. Bahr and Rasmussen are both employed by respondent Boise Cascade Corporation (Boise). As a result of statements Rasmussen made in the workplace, Bahr filed a defamation action against Rasmussen, Boise, and Eural Dobbs, Bahr's supervisor at Boise. The district court denied respondents' motion for summary judgment and the matter proceeded to trial. The jury found in favor of Bahr and against Rasmussen and Boise.[1] The district court had denied respondents' motions for judgment as a matter of law (JMOL) made at the close of Bahr's case in chief and again at the close of the evidence. Following the jury's verdict, the court also denied respondents' renewed JMOL motion made after trial, and entered judgment for Bahr as to respondents Rasmussen and Boise.

Respondents appealed, and the court of appeals reversed, concluding in relevant part that "the jury's finding of malice [was] contrary to the evidence." *Bahr v. Boise Cascade Corp.*, No. A07–1353, 2008 WL 2966433, at *6 (Minn.App. Aug.5, 2008). We granted Bahr's petition for review. Because we conclude that the evidence of actual malice as to respondent Rasmussen was legally sufficient, but that the evidence of actual malice as to respondent Boise was not legally sufficient, we reverse the court of appeals' decision as to Rasmussen and affirm the court of appeals' decision as to Boise.

The record reflects that Bahr and Rasmussen were employed as stores keepers at the Boise paper mill in International Falls, Minnesota, when the events at issue in this action occurred. Stores keepers are employed to handle stock in the warehouse at the Boise mill. Dobbs, who is Rasmussen's uncle, was Bahr's supervisor. This action arises from events that occurred at the Boise mill on September 27, 2001 and on October 18, 2001. Because these events form the basis of this action, we discuss them in some detail.

*September 27, 2001*

On the morning of September 27, 2001, three Boise stores keepers told Rasmussen that they had heard a rumor that Rasmussen had been involved in an extramarital affair with another stores keeper, R.B. The stores keepers did not identify the source of the rumor, but they told Rasmussen that he was scheduled to work with the person who started it. Rasmussen then learned that he was scheduled to work that day in the West Warehouse, where Bahr worked. Rasmussen became agitated and paced up and down the loading ramp, apparently upset both by the rumor and by a special work assignment he received that day. Two of Rasmussen's co-workers heard him say, "I have to work with that lazy, fat f* * *er." The two co-workers understood the comment as a reference to Bahr. Rasmussen testified that he did not mean for his co-workers to hear the comment.

Later that morning, Rasmussen went to R.B.'s office to talk about the rumor. R.B. had already learned of it from the same stores keepers, who had told her that Bahr started the rumor. With Rasmussen in her office, R.B. telephoned the storeroom area where Bahr was working. Bahr answered the phone and denied starting the rumor, then passed the phone to another stores keeper, who also denied starting the rumor. That stores keeper passed the

---

1. The jury found that Dobbs did not make any defamatory statements, and the district court therefore entered judgment in favor of Dobbs as to the claim against him. Bahr did not appeal the judgment in favor of Dobbs.

phone to a third stores keeper, J.P., who admitted to R.B. that he started the rumor. Rasmussen remained in R.B.'s office during the phone call and stayed several minutes afterward. Rasmussen testified that he did not know with whom R.B. spoke on the phone and that he did not learn the source of the rumor that day. According to Rasmussen, he learned that J.P. started the rumor "within a few weeks" of September 27, 2001.

Rasmussen testified that, later that morning, Bahr, J.P., and a third stores keeper confronted Rasmussen about the phone call. Rasmussen testified that he "felt threatened and harassed" by them, and said that he would be setting up a meeting with Jack Strongman, the Director of the Human Resources Department, about it. Rasmussen also said that he immediately reported the incident within the company to the Boise Controller, although he would have reported it to Dobbs if Dobbs had not been on vacation.

At trial, Bahr and J.P. testified about individual efforts to discuss the rumor incident with Rasmussen. Bahr testified that he tried to find out why Rasmussen was upset with him, but that Rasmussen would not talk to him, saying only that there was going to be a meeting with Human Resources. Bahr said that he asked Rasmussen about the Human Resources meeting twice in the following weeks, but both times Rasmussen said that a meeting had not been set up and that he could not talk about it.

J.P. testified that he tried to "patch things up" with Rasmussen the same day he told R.B. he was the source of the rumor, but that Rasmussen would not talk to him. Bahr described to the jury that he saw J.P. trying to talk to Rasmussen and that, while he could not hear what they were saying, he saw Rasmussen "hollering" and waving his arms during the exchange. Another stores keeper described

seeing the exchange between J.P. and Rasmussen, and she said that Rasmussen was "hollering," but she could not hear about what.

*October 18, 2001*

On October 18, 2001, Bahr asked Rasmussen about the Human Resources meeting a third time, but Rasmussen said he had not heard back about it. Bahr told Rasmussen that Bahr had contacted Jack Strongman and knew that Rasmussen had not set up the meeting. According to Rasmussen, Bahr was seated on a forklift truck when he questioned Rasmussen about the Human Resources meeting, and Rasmussen stood on a ramp at least five feet away, at eye-level with Bahr. Rasmussen testified that Bahr told him that Bahr had caught Rasmussen in a lie and that Rasmussen could lose his job.

Bahr testified, however, that he told Rasmussen that he had seen Jack Strongman, who said there was no meeting set up. Bahr said that he told Rasmussen he believed that Rasmussen was calling Strongman a liar in saying that Rasmussen was waiting to hear back from Strongman about a meeting. Bahr explained at trial that Rasmussen responded by throwing up his arms, hollering, and screaming as he turned to go down the ramp. Bahr testified that during this encounter he spoke to Rasmussen in a "normal, everyday voice." Another stores keeper, G.U., who stood 20 to 30 feet from Rasmussen and Bahr at the time, reported that he did not hear any voices raised during the Bahr/Rasmussen exchange.

Rasmussen telephoned Dobbs at approximately 10 a.m. that morning, October 18, 2001, to discuss the encounter he had with Bahr. Rasmussen told Dobbs that everywhere he went in the mill he was being confronted by Bahr. Dobbs' notes of the telephone call indicate that Rasmussen said that Bahr "had approached him . . . in

a threatening manner," and that as a result of the encounter, Rasmussen "thought he could no longer do his job without constantly being intimidated and harassed." Dobbs told Rasmussen to stay where he was and that Dobbs would get back to Rasmussen.

Dobbs immediately called Barb Johnson, a Boise Human Resources Coordinator. Johnson instructed Dobbs to speak with Rasmussen again, to write down Rasmussen's information, and to report back to her with that information. Johnson did not instruct Dobbs to get information from Bahr about the incident. Dobbs then met with Rasmussen and took notes about Rasmussen's account of what happened that morning. During this meeting, Rasmussen repeated that Bahr approached him in a "threatening manner," and Rasmussen said that Bahr told him that "things were going to change" at the mill. Dobbs testified at trial that Rasmussen was "clearly agitated" and "upset" during the meeting. Dobbs then telephoned Johnson and related Rasmussen's account. Johnson instructed Dobbs to have Bahr escorted from the building and placed on "investigatory suspension." Johnson again did not instruct Dobbs to seek information from Bahr as to his side of the events, and Dobbs did not do so.

Dobbs followed up by escorting Bahr off the premises at approximately 11 a.m. on October 18, 2001. Bahr testified that when he asked Dobbs for a reason why he

had to leave, Dobbs replied that he could not talk to Bahr. Dobbs testified that he told Bahr that the company received a complaint against him and he needed to send Bahr home.[2] After being escorted from the Boise premises, Bahr visited his union representative to initiate a grievance against Boise. The union representative contacted Dobbs, who responded that he could not discuss why Bahr was escorted from the building.[3]

*Boise Investigation*

That afternoon, at 2 p.m., Rasmussen and R.B. met with Betty Leen, another Boise Human Resources Coordinator, to file an informal harassment complaint against Bahr. According to Leen's notes, Rasmussen and R.B. made three allegations of misconduct: (1) Bahr started the rumor about Rasmussen having an affair with R.B.; (2) Bahr "yells and shouts and he is almost to the point of physical violence"; and (3) Bahr "will do as little as possible because he is mad at Boise." Because Rasmussen was "worried" that Bahr would "put something in it," Rasmussen told Leen that he checks his "lunch bucket" and his "garage at home."[4]

Based on the complaint, Boise began an investigation of the allegations against Bahr. On October 19, 2001, Betty Leen met with Bahr and the union representative as part of the investigation. According to Leen's notes, Bahr "denie[d] everything," and said that Rasmussen has been

---

2. Strongman testified that Boise's company policy dictated that an employee excused from the premises should be told why the employee is being asked to leave.

3. Ultimately, Boise suspended Bahr for three days without pay for the time he was on investigatory suspension, but as a result of the parties' settlement after Bahr filed a union grievance, the salary was repaid to him.

4. At trial, R.B. said that she attended this meeting only as moral support for Rasmussen

and did not intend to file a complaint against Bahr. R.B. denied making any of the specific complaints that were attributed to her in the meeting notes recorded by Betty Leen. R.B. also testified that she has never observed Bahr yelling or near physical violence and that Bahr is a good worker. Rasmussen, however, testified that he and R.B. filed the complaint together, that they were both vocal in the meeting, and that he cannot now recall whether specific allegations were made by him or by R.B.

angry because he had to "do stock in the West Warehouse" (where Bahr works). Bahr also said that Dobbs harasses Bahr.[5]

In addition to interviewing Bahr, Leen spoke with two other stores keepers that day as part of the investigation. After she completed these interviews, Betty Leen gave her notes to Barb Johnson, who continued the investigation.

On October 22, 2001, Johnson met with Rasmussen. The union representative was also present. Rasmussen described the October 18 encounter with Bahr, stating that Bahr was "yelling" and "threaten[ed] saying [you're] in deep shit!" and "'you're going to get your day!'" About the affair rumor, Rasmussen stated that both J.P. and Bahr were the source. He also said that he was "afraid of [Bahr] planting something" in his lunch or garage "now that [Rasmussen has] stepped up for [himself]." Rasmussen also said that Bahr does not want other employees to work faster than Bahr does and that Bahr "has said to slow down work."

Johnson also interviewed three other stores keepers who worked with Rasmussen and Bahr. She interviewed J.P. via telephone on October 22, 2001, and he confirmed that he was the source of the affair rumor. She also interviewed J.S., a Boise stores keeper who voluntarily went to Johnson to support Rasmussen. J.S. said that he believed Rasmussen, that he also had had difficult encounters with Bahr, and that Bahr had said "not to work so fast." On October 23, 2001, Johnson interviewed the third stores keeper, and she said that Bahr had never said anything to her about slowing down the work.

On October 25, 2001, Barb Johnson interviewed Bahr. Dobbs and the union representative were also present. Bahr described the October 18 encounter with Rasmussen and denied threatening him in any way.[6] Johnson asked Bahr about the specific allegations Rasmussen had made, and Bahr denied any misconduct.

At the end of the interview, Johnson and Dobbs conferred privately and a decision was made that Bahr would be suspended for three days and asked to sign a "last-chance agreement." Bahr testified that Johnson and Dobbs were gone for only a short time, and that when they returned to the room, they told him about the discipline. Bahr's theory at trial was that Boise had decided to discipline him even before Boise sought his side of the story. Boise denied this and Johnson testified that a preliminary decision was made to discipline Bahr but that it was dependent on what Boise learned from him.

The "last-chance agreement" required Bahr's signature as an indication that he accepted the discipline. Under the "last-chance agreement," Bahr would have had to acknowledge Rasmussen's allegations of harassment and agree that, if he committed one more violation of company policy, he could be terminated. Bahr told the company representatives that he would not sign the "last-chance agreement," and Boise subsequently withdrew it, but the three-day suspension remained in place.

On November 14, 2001, Bahr filed a grievance concerning the three-day suspension that was settled on May 27, 2003. The settlement included that all incidents and reports were erased from Bahr's rec-

---

**5.** The notes Leen took from this interview with Bahr do not reflect a specific discussion with Bahr about the October 18 incident.

**6.** Bahr also said that another employee, G.U., was standing about "8–10" feet away during his exchange with Rasmussen and that he was

not sure if G.U. heard anything. The record reflects that Johnson interviewed G.U. on October 25, 2001, but it is not clear whether this happened before or after her interview with Bahr. G.U. said that he did not hear any raised voices.

ord and Bahr was refunded his lost pay from the suspension.

*Defamation Action*

Bahr filed the present defamation lawsuit in September 2003. In his complaint, Bahr alleged that, on October 18, 2001, Rasmussen "communicated to Dobbs a false and defamatory statement." Bahr further alleged that both Dobbs and other "management level employees of Bosie" communicated these statements to "additional parties." Respondents moved for summary judgment, which the district court denied. During trial, respondents moved under Minn. R. Civ. P. 50.01 for JMOL at the close of Bahr's case in chief, arguing that a qualified privilege applied to the statements at issue and that Bahr had not shown malice sufficient to defeat the privilege.[7] The district court denied this motion. At the close of the evidence, respondents again moved under Minn. R. Civ. P. 50.01 for JMOL on the same grounds. The court again denied the motion and found sufficient evidence to create a fact question for the jury as to the existence of actual malice.

The jury found in favor of Bahr against Boise and Rasmussen, but determined that Dobbs had not made any defamatory statements. After trial, respondents renewed their motion for JMOL under Minn. R. Civ. P. 50.02 on the same grounds as the earlier motions.[8] After a hearing, the district court denied the motion. Respondents appealed, and the court of appeals reversed. *Bahr*, 2008 WL 2966433, at *6. The court of appeals held that the district court erred in submitting to the jury the question of actual malice as to both respondents, Rasmussen and Boise. *Id.* We granted Bahr's petition for review.

## I.

We turn first to our scope of review. *See generally* 3 Eric J. Magnuson & David F. Herr, *Minnesota Practice–Appellate Rules Ann.* § 103.17 (2008) (discussing distinction between scope of review and standard of review). The scope of review refers to the "matters that are properly before the appellate court for its consideration." *Id.* Under Minn. R. Civ.App. P. 103.04, "on appeal from a judgment [the appellate court] may review any order involving the merits or affecting the judgment." In their appeal, respondents challenge the district court's denial of their motion for summary judgment and the denial of their motions for JMOL.

The scope of review question implicated in this case is whether the denial of a motion for summary judgment is reviewable on appeal after judgment is entered on a jury verdict. We do not appear to have directly addressed this question. Our cases seem to have implicitly assumed, as the court of appeals did in this case, that the denial of summary judgment was within the scope of review on appeal. For example, in *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 311 (Minn.1995), we examined whether the district court properly denied summary judgment even though the case was on appeal after a jury verdict. But we did not discuss whether the summary judgment decision was properly within the scope of review on appeal.

---

7. Under Minn. R. Civ. P. 50.01(a), "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may decide the issue against that party and may grant a motion for judgment as a matter of law against that party."

8. Under Minn. R. Civ. P. 50.02, "[w]hether or not the party has moved for judgment as a matter of law before submission of the case to the jury, a party may make or renew a ... motion within the time specified in Rule 59 for the service of a motion for a new trial."

*See id.* We take the opportunity to address this question now.

In their motion for summary judgment, respondents argued that there was no genuine issue of fact relative to actual malice. The district court concluded otherwise and submitted the matter to the jury. The jury ruled against respondents, finding that both Rasmussen and Boise acted with actual malice. Review of the denial of summary judgment in the procedural posture here would require the appellate court to review in essence two sets of evidence: (1) the evidence of actual malice offered at the summary judgment stage to show there was a dispute as to a material issue of fact and (2) the evidence produced during the trial. *See Black v. J.I. Case Co., Inc.*, 22 F.3d 568, 572 (5th Cir.1994). But the question is the same: whether, from the evidence, a reasonable jury could conclude that respondents acted with actual malice. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 545 n. 9 (Minn.2001) (noting that "standards for granting summary judgment and for granting judgment as a matter of law are the same").

The United States Court of Appeals for the Eighth Circuit has held, in a case similar to this one where both denial of summary judgment and a motion for JMOL were challenged on appeal, that it would not review the "denial of a motion for summary judgment after a trial on the merits." *Equal Employment Opportunity Comm'n v. Sw. Bell Tel., L.P.*, 550 F.3d 704, 708 (8th Cir.2008). This appears to be the "majority" rule in the federal appellate courts. *See Metro. Life Ins. Co. v. Golden Triangle*, 121 F.3d 351, 355 (8th Cir.1997) (citing cases). We agree with the federal courts. Where a trial has been held and the parties have been given a full and fair opportunity to litigate their claims, "[i]t makes no sense whatever to reverse a judgment on the verdict where the trial evidence was sufficient merely because at summary judgment it was not." *Black*, 22 F.3d at 572; *see also Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 434 (8th Cir.1994) (noting that when the jury has made a finding on that factual question and court enters judgment on that verdict, the entry of judgment "supersedes the earlier summary judgment proceedings").

While under our rule the appellate court has the authority to review orders that "affect" the judgment being appealed, Minn. Civ. R.App. P. 103.04, a denial of a motion for summary judgment in a case such as this cannot be viewed as "affecting the judgment." This is because the district court's conclusion at the summary judgment stage that there was a genuine dispute of fact becomes moot once the jury reaches a verdict on that issue. *See generally* 19 James Wm. Moore et al., *Moore's Federal Practice* § 205.08[2] (3d ed. 2009) ("[R]eview of a denial of a directed verdict or judgment as a matter of law motion obviates the need for review of a denial of a pre-trial summary judgment motion."). For these "prudential concerns," *Black*, 22 F.3d at 572, we adopt the rule articulated in the federal cases.[9] We therefore hold

---

9. Some courts have recognized an exception to the rule where the denial of summary judgment is based on a legal conclusion on an issue that is not presented to the jury for determination. *See U.S. ex rel. A + Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 441 (6th Cir.2005) (noting "that where the denial of summary judgment was based on a question of law rather than the presence of material disputed facts, the interests underlying the rule are not implicated" (citing *Pas-* *chal v. Flagstar Bank, FSB*, 295 F.3d 565, 572 (6th Cir.2002))). *But see Metro. Life*, 121 F.3d at 355 (concluding "that Met Life's proposed dichotomy, between a summary judgment denied on factual grounds and one denied on legal grounds, is both problematic and without merit"). It is not necessary for us to address the exception in this case because there is no indication in the record that the district court's denial of summary judgment

that the denial of respondents' motion for summary judgment is not properly within the scope of review on appeal from the judgment, and we will not consider it. To the extent our prior decisions either stated or implied that it was appropriate for the appellate court to review the denial of a summary judgment in circumstances such as are presented here, *see, e.g., SCSC Corp.*, 536 N.W.2d at 311, they are overruled.

## II.

We turn next to consider Bahr's defamation claim against Rasmussen and to examine whether the district court properly denied respondents' motion for JMOL. We apply de novo review to the district court's denial of a Rule 50 motion. *See Langeslag v. KYMN, Inc.*, 664 N.W.2d 860, 864 (Minn.2003) (stating that motions for judgment as a matter of law are reviewed de novo).[10] We apply the same standard employed by the district court. *See McGreevy v. Daktronics, Inc.*, 156 F.3d 837, 840 (8th Cir.1998) ("We review a dis-

trict court's decision to grant [judgment as a matter of law] de novo, applying the same standards as those used by the district court."). Under Minn. R. Civ. P. 50.01, the court may grant judgment as a matter of law if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." If reasonable jurors could differ on the conclusions to be drawn from the record, judgment as a matter of law is not appropriate. *Sip–Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). Finally, we view the evidence in the light most favorable to the prevailing party, which in this case is Bahr. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn.1980).[11]

To establish a defamation claim, a plaintiff must prove three elements: (1) the defamatory statement is "communicated to someone other than the plaintiff," (2) the statement is false, and (3) the statement "tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the

---

was based on anything other than its determination that there was sufficient evidence of actual malice presented in the record at the summary judgment stage to create a fact issue for the jury as to the existence of actual malice. The district court did not explain in any detail the basis of its decision to deny summary judgment, but based on the requirements of Minn. R. Civ. P. 56.03, we assume the court's decision was based on the court's conclusion that there was sufficient evidence of malice presented to create a question of fact for trial. *See* Minn. R. Civ. P. 56.03 (noting that "[j]udgment shall be rendered" where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law"). The jury resolved that factual dispute in favor of Bahr.

**10.** In *Langeslag*, we addressed a motion for judgment notwithstanding the verdict. 664 N.W.2d at 864. Under Minn. R. Civ. P. 50, there are no longer motions for directed verdict or motions for judgment notwithstanding

the verdict. Both motions are now called motion for "judgment as a matter of law."

**11.** Bahr argues that the court of appeals applied an incorrect standard of review that disregarded evidence favorable to him and viewed the evidence in the light most favorable to the respondents. The court of appeals reviewed the denial of summary judgment and JMOL motions under the standard that "[e]vidence must be viewed 'in the light most favorable to the party against whom judgment was granted.'" *Bahr*, 2008 WL 2966433, at *3 (quoting *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993)). Because the district court did not *grant* any motions in this case, the court of appeals stated the *Fabio* standard out of context. But, in our review of the court of appeals' opinion, it appears that the court did consider the evidence in the light most favorable to Bahr. *See Bahr*, 2008 WL 2966433, at *3 (noting that the court was to review the evidence " 'in the light most favorable to the prevailing party [i.e. Bahr]' ").

estimation of the community." *Stuempges,* 297 N.W.2d at 255. If the defamation "affect[s] the plaintiff in his business, trade, profession, office or calling," it is defamation per se and "thus actionable without any proof of actual damages." *Id.* In a special verdict form, the jury found that Rasmussen made statements that were defamatory per se.

Our analysis begins with the statements that Bahr contends were defamatory. The broad allegations of Bahr's complaint against Rasmussen seem to encompass four separate statements.[12] On October 18, 2001, Rasmussen stated to Dobbs that Bahr "had approached [Rasmussen] ... in a threatening manner." Later that day, Rasmussen made three more statements to Betty Leen, a Human Resources Coordinator: Bahr started the September 27 affair rumor; Bahr "yells and shouts and is almost to the point of physical violence"; and Bahr "will do as little as possible," "doesn't finish his work," and urges others to do the same.

■ The district court concluded that Rasmussen's statements were protected by a qualified privilege. *Lewis v. Equitable Life Assurance Soc'y of the U.S.,* 389 N.W.2d 876, 889 (Minn.1986) (recognizing qualified privilege for statements made by former employer for employment recommendations). The existence of the privilege is a matter of law for the court, and the parties do not challenge on appeal the court's legal determination that the privilege applies.

■ Rather, the parties dispute whether Bahr offered sufficient evidence that Rasmussen abused the privilege because he made the statements with actual malice. *See Stuempges,* 297 N.W.2d at 257 (noting that the plaintiff has the burden to

prove that the privilege was abused by showing actual malice). Actual malice requires a showing that the defamatory statements are " 'made ... from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.' " *Stuempges,* 297 N.W.2d at 257 (quoting *McKenzie v. William J. Burns Int'l Detective Agency, Inc.,* 149 Minn. 311, 312, 183 N.W. 516, 517 (1921)). Malice is not proved merely by the fact that the statement has been made or by the fact that the statement is later proven to be false. *Bol v. Cole,* 561 N.W.2d 143, 150 (Minn.1997). But malice may be proved by evidence "extrinsic" to the statement or by evidence "intrinsic" to the statement. *Friedell v. Blakely Printing Co.,* 163 Minn. 226, 231, 203 N.W. 974, 976 (1925) (stating that "extrinsic" evidence includes proof of personal ill feeling and "intrinsic" evidence includes "exaggerated language," "the character of the language used," "the mode and extent of publication, and other matters in excess of the privilege").

■ Respondents argue that the record does not support the district court's submission of the actual malice question to the jury. Bahr argues that the evidence was sufficient to create a jury issue on the existence of Rasmussen's actual malice. We agree with Bahr. Our review of the trial record reveals four pieces of evidence that, when considered together and construed in the light most favorable to Bahr, provide a "legally sufficient basis for a reasonable jury" to conclude that Rasmussen made the defamatory statements in his harassment complaint with actual malice. *See* Minn. R. Civ. P. 50.01.

First, Bahr presented evidence that, on September 27, 2001, Rasmussen referred to him as a "lazy, fat f* * *er" in front of

---

**12.** At the court of appeals, respondents argued that Bahr did not plead defamation with sufficient specificity. The court of appeals disagreed and respondents did not seek review on that issue. *Bahr,* 2008 WL 2966433, at *3.

two Boise employees. Respondents argue, and the court of appeals held, that this comment shows a mere personality conflict. Citing *Bauer*, respondents contend that a mere personality conflict does not equal actual malice. *Bauer v. State*, 511 N.W.2d 447, 451 (Minn.1994). But in *Bauer* we did not say that a personality conflict can never constitute evidence of actual malice. We said that "not every personality conflict, where the parties simply in exasperation trade insults, suffices" to prove actual malice. *Id.* We also said that "[m]alice can be shown, of course, by direct proof of personal spite." *Id.* Rasmussen's September 27 comment is relevant to the question of actual malice because it could constitute "direct proof of personal spite." *Id.*

Respondents also contend that the September 27 comment, having been made weeks before the defamatory statement, is not relevant to the question of actual malice. We disagree. In *Stuempges*, we concluded that the district court properly submitted the actual malice question to the jury based in part on the plaintiff's evidence of hostile encounters between the plaintiff and the defendant prior to the defamatory conduct. 297 N.W.2d at 258. Similarly, Rasmussen's comment, while made approximately three weeks before the defamatory conduct, is not so remote as to be rendered irrelevant to the question of whether Rasmussen's ill will motivated the publication of the defamatory statements.

Second, Bahr presented evidence that Rasmussen expanded the scope of his allegations of Bahr's misconduct beyond the harassment complaint, which provides further support for the conclusion that the defamatory statements in the complaint

were made from ill will or an improper motive. Specifically, in Rasmussen's complaint to Betty Leen, Rasmussen went beyond the scope of describing incidents of harassment by complaining about Rasmussen's general work ethic. Citing *Bol*, 561 N.W.2d at 150, respondents seemingly argue that the statement itself cannot form the basis of a finding of actual malice. But in *Bol*, we acknowledged that exaggerations and " 'other matters in excess of the privilege' " contained within the defamatory statement are intrinsic indicators of malice. *Bol*, 561 N.W.2d at 150 (quoting *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn.1986)) (holding that the plaintiff did not present evidence of exaggeration or the like that would create a fact question about malice for the jury).[13] Rasmussen's comments about Bahr's work habits could support the conclusion that Rasmussen's motivation was not to report harassment, but was a desire to get his coworker in trouble at work.

Third, Leen's notes reflect that Rasmussen filed the harassment complaint because Bahr "needs a wake up call." A qualified privilege can be lost if statements are not made in furtherance of the purpose that the privilege protects. W. Page Keeton, *Prosser and Keeton on Torts* § 115, at 834 (5th ed.1984). Viewed in the light most favorable to Bahr, this comment is relevant to whether Rasmussen acted with an improper motive (i.e., creating employment problems for Bahr) in filing the complaint, beyond the proper motive of protecting himself from harassment.

■ Fourth, Bahr presented evidence from which a reasonable jury could infer that Rasmussen knowingly made a false statement in his complaint to Betty Leen.

**13.** Respondents also rely on *Buchanan v. State Dep't of Health*, 573 N.W.2d 733, 738 (Minn.App.1998). But in that case, the court of appeals quoted the same language from *Frankson* that we relied on in *Bol. Buchanan*, 573 N.W.2d at 738 (quoting *Frankson*, 394 N.W.2d at 144).

Specifically, Rasmussen stated that Bahr started the September 27 affair rumor. We have said that, to show malice, it is not enough to present evidence that the defamatory statement is false—indeed, falsity is an element of the defamation. *See Bol,* 561 N.W.2d at 150. But we have distinguished between good and bad faith in making false statements. *Friedell,* 163 Minn. at 231, 203 N.W. at 975–76. Making a false statement knowing that it is false constitutes bad faith, and "[i]f it appears that the publisher knows the statement he makes is false, we need go no further" in examining the question of actual malice. *Id.,* 203 N.W. at 976. Because we focus on the state of the mind of the utterer, if the plaintiff presents evidence that the utterer knew the falsity of his statements when published, such bad faith in publishing is relevant evidence of malice.

Respondents note that knowledge of falsity is an element of actual malice for media defendants under the standard announced in *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and argue that it therefore is not relevant to the actual malice question under the common law. The *New York Times* actual malice standard is a higher standard than that required by the common law. *Stuempges,* 297 N.W.2d at 258 (stating that the *New York Times* standard "was fashioned as an exception to the common law rule to permit the . . . media to perform their function . . . without undue fear of defamation liability"). A plaintiff does not need to show that the defendant made the defamatory statement with knowledge that it was false to satisfy the common law standard. *Id.* at 257–58, 84 S.Ct. 710. But if a plaintiff's evidence meets the higher standard, the same evidence is also probative on the question of whether the less rigorous common law standard is met.

Here, Bahr presented evidence that Rasmussen knowingly published a false statement that Bahr started the September 27 affair rumor. J.P. admitted to R.B. that he was the source of the rumor. Rasmussen was present when R.B. spoke on the phone with Bahr and J.P., and R.B. berated J.P. for starting the rumor at that time. J.P. testified that he tried to "patch things up" with Rasmussen on September 27. R.B. testified that she told Rasmussen within a few weeks of September 27 that J.P. had started the rumor. Yet, Barb Johnson recorded, in an October 22, 2001 interview with Rasmussen, that Rasmussen said the rumor "did come from both [J.P.] and LeRoy [Bahr]." Taken in the light most favorable to Bahr, this evidence creates a fact question about whether Rasmussen alleged that Bahr started the rumor while knowing that J.P. started the rumor.

In sum, the four pieces of evidence discussed above, when assessed together and construed in the light most favorable to Bahr, could lead a reasonable jury to find that Rasmussen published the defamatory statements from ill will and in an effort to cause employment problems for Bahr, and that Rasmussen therefore acted with actual malice. In light of the foregoing evidence presented by Bahr at trial, we reverse the court of appeals and hold that the district court did not err in denying respondent's motions for JMOL as to Rasmussen's actual malice. The court of appeals, however, did not resolve the other legal issues presented by respondents including whether the statements were protected statements of opinion, were true and therefore not defamatory, and were not defamatory per se. *Bahr,* 2008 WL 2966433, at *2, *6. Accordingly, we remand the defamation claim against Rasmussen to the court of appeals for consideration of these issues.

### III.

We turn next to consider respondents' claim that the district court erred in denying their motion for JMOL on the defamation claim against Boise and to examine whether the district court properly concluded that a reasonable jury could find that Boise acted with actual malice. The defamatory statements alleged against Boise are the statements made by Rasmussen as those statements were repeated in the course of Boise's harassment investigation. The repetition of Rasmussen's statements includes statements made in Boise Human Resources personnel's interviews with Boise employees, discussions with Bahr and the union representative, and documents issued to Bahr that explained the reason for disciplinary action.

We agree with the district court and the court of appeals that statements made in the course of an employer's investigation into employee misconduct are protected by the qualified privilege. *See Bahr*, 2008 WL 2966433, at *5. This privilege extends to investigations of employee misconduct because "the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 97, 235 N.W.2d 371, 374 (1975) (holding that plaintiff did not present sufficient evidence to submit a malice issue to the jury because the employer's allegation that the employee had stolen was based in truth, was made with a qualified privilege, and the employee did not present evidence to the contrary); *see also Otto v. Charles T. Miller Hospital*, 262 Minn. 408, 414, 115 N.W.2d 36, 40 (1962) (holding that hospital did not abuse its privilege by disseminating slanderous statement about employee suspected of starting fires in the course of an arson investigation); *accord Wirig v. Kinney Shoe Corp.*, 461 N.W.2d 374, 380–81 (Minn.1990) (holding that qualified privilege did not apply because the employer repeated the allegations without taking any "steps to investigate but relie[d] entirely on accusations either made by employees who may be biased or on secondhand hearsay with no identification of sources").

Despite the protection afforded for internal corporate investigations, Bahr argues that Boise abused its privilege, as evidenced in the actions of Boise managers. Bahr contends that Boise's actual malice was demonstrated from two sources: (1) the manner in which the Boise Human Resources Department undertook the investigation, and (2) manifestations of ill will by Eural Dobbs.

#### A. Manner of the Investigation

Bahr contends, in essence, that Boise undertook a sham investigation. In other words, he argues that Boise was determined to discipline him no matter what the investigation revealed and that its investigation was designed, not to investigate the truth of Rasmussen's harassment allegations, but was designed to injure his relationship with the company. *See McBride*, 306 Minn. at 98, 235 N.W.2d at 375 (noting that malice may be shown where the defendant acts "causelessly and wantonly to injure plaintiff"). Bahr offers two theories to support his conclusion about Boise's motive for the investigation.

First, Bahr points to Betty Leen's notes from her October 18, 2001 meeting with Rasmussen reflecting that both Rasmussen and R.B. accused Bahr of harassment. Bahr further cites R.B.'s testimony that she attended the meeting only to support Rasmussen, but that she did not intend to file a complaint against Bahr. From this evidence, Bahr suggests Boise exaggerated the nature of the harassment allegations and that such exaggeration supports an inference that Leen was prejudiced against him.

Even if we assume that Leen's erroneous attribution of the harassment allegations to R.B. could be viewed as evidence that Leen was prejudiced against Bahr, such prejudice does not support the inference that Boise published defamatory statements with actual malice. The defamatory statements Boise is alleged to have made were its repeating the defamatory harassment allegations during its investigation. The evidence establishes that the number of people who reported the harassment allegations, whether Rasmussen reported them alone or whether R.B. also reported those allegations, had no bearing on the nature of Boise's investigation. It was the *fact* of the harassment complaint that caused Boise to conduct the investigation (and thus repeat the defamatory statements), not the number of people who claimed to have been harassed. Regardless of the number of people who attended the meeting to file the complaint, the Boise "Corporate Policy" establishes that Boise would have undertaken the investigation. Under the Boise "Corporate Policy," "harassment of any employee by any … co-worker … will not be tolerated" and will trigger a "prompt and thorough investigation." In other words, the record does not support a conclusion that Leen fabricated the number of people complaining about Bahr in order to cause an investigation in which defamatory statements about Bahr would be repeated.

Second, Bahr argues that Boise management conducted a sham investigation because the evidence shows that Boise predetermined an outcome of discipline before completing the investigation, and that Boise management disregarded any facts revealed in the investigation that favored Bahr. Bahr also relies on the fact that he was escorted from the mill without explanation and without an opportunity to provide his version of the events, and he

argues that this shows that Boise had ill will toward him. From this evidence, Bahr argues that a reasonable jury could conclude that Boise acted with actual malice. We disagree.

The question is whether Boise conducted its investigation, during which it is alleged to have re-published the defamatory statements, with actual malice. The record conclusively shows that Boise management undertook an investigation not from ill will, but in order to determine the validity of Rasmussen's allegations. Boise management began the investigation according to the Corporate Policy, which provide that, "A prompt and thorough investigation will be conducted, and appropriate disciplinary action, up to and including termination, will be taken against any employee who is found to have been responsible for harassment or for knowingly permitting a hostile work environment to exist." Boise limited republication of the alleged defamatory statements to employees that the company could have reasonably believed would provide some information about the truth or falsity of Rasmussen's allegations. Questions asked of the interviewees, moreover, remained within the scope of allegations. And Boise interviewed Bahr twice during this investigation to obtain his version of the events.

■■■ With respect to the decision to discipline, the record shows that, during the investigation, Barb Johnson spoke with Jack Strongman, the head of the Human Resources Department, about possible avenues of discipline if the allegations were believed to be true. Johnson made a preliminary decision to impose a three-day suspension, but she testified that the final decision to discipline was not made until after Boise had heard from Bahr and completed its investigation. Bahr offered no evidence to contradict this testimony.[14]

14. Bahr's brief argues that "Boise management finally conceded and realized that they

It might be argued that Boise should have conducted a more detailed or different investigation prior to imposing discipline. But pointing merely to instances in which Boise might have better conducted the investigation does not provide a basis for a reasonable jury to conclude that Boise repeated defamatory statements motivated by a design to causelessly and wantonly injure Bahr. *See Stuempges,* 297 N.W.2d at 257.

## B. Dobbs' Ill Will

In addition to his argument about the manner of the investigation, Bahr also argues that the record supports a finding of actual malice against Boise because ill will of his supervisor, Eural Dobbs, can be imputed to Boise. Dobbs is a management-level employee at Boise. We have decided that, for purposes of showing actual malice by a corporation, the corporation is liable for the acts of its employees, under the rule of respondeat superior. *Friedell,* 163 Minn. at 232, 203 N.W. at 976. If an employee acts with malice in matters that would otherwise be subject to qualified privilege, the employee's malice can be imputed to the corporation if the employee's malice "is so mingled with his regular work and the scope of his employment that it must follow that the wrongful act is done in the course of his employment." *Id.* at 234, 203 N.W. at 977. Thus, if Bahr presented enough evidence that Dobbs manifested ill will toward Bahr, and if Bahr could show that Boise's defamatory statements were made from that ill will, Dobbs' malice could be imputed to Boise. *See Stuempges,* 297 N.W.2d at 257 (stating well-settled Minnesota law that the plaintiff proves malice where the defendant " 'made the statement *from* ill

will' " (quoting *McKenzie v. WM. J. Burns Int'l Detective Agency, Inc.,* 149 Minn. 311, 312, 183 N.W. 516, 517 (1921) (emphasis added))).

When construed in the light most favorable to Bahr, the record shows some evidence that Dobbs harbored ill will toward Bahr. For example, Bahr testified that when Dobbs escorted Bahr from the mill on October 18, 2001, Dobbs refused to give Bahr a reason for the expulsion, even though company policy dictated that a reason should be given. Bahr also presented evidence that he and Dobbs had clashed several times during 2001 over Bahr's workload assignments and vacation time.

But Bahr's claim that Dobbs' actions create a fact question as to Boise's malice fails because Bahr has not presented evidence to show that Boise's defamatory statements in the course of the investigation were motivated by Dobbs' ill will. The jury found that Dobbs did not make any defamatory statements, and there was no evidence presented that Dobbs orchestrated, managed, or conducted the Boise investigation. Boise's Corporate Policy, which says that "Boise Cascade is committed to providing a professional work environment for its employees that is free from physical, psychological, or verbal harassment," and that "[a] prompt and thorough investigation will be conducted" for such matters, indicates that Boise was required to and would have investigated Rasmussen's complaint irrespective of Dobbs' feelings about Bahr. Finally, there is no evidence that Dobbs caused Rasmussen to come forward and report Bahr's behavior.

had no factual basis for any disciplinary actions" when they settled on Bahr's grievance. But the Settlement Agreement provides that the grievance was settled without "an admission by any party of any wrong doing." Thus,

the fact that Boise ultimately withdrew the discipline does not provide a basis for a reasonable jury to conclude that the investigation was motivated by actual malice.

In sum, there is no evidence from which a reasonable jury could conclude that Dobbs' personal ill feelings towards Bahr caused Boise's defamation. Bahr has not shown that Dobbs' ill will was connected to Boise's defamatory statements, and the only motivating force for Boise's statements revealed in the evidence is Boise's legitimate pursuit of the internal corporate investigation. *See also Boston Mut. Life Ins. Co. v. Varone,* 303 F.2d 155, 159 (1st Cir.1962) ("But if the motivating force for the publication is shown not to be the ill will, its existence is immaterial. Incidental gratification of personal feelings is irrelevant."). We therefore hold that Boise was entitled to judgment as a matter of law in the district court with respect to Boise's alleged defamation because Bahr did not present sufficient evidence for a reasonable jury to find in favor of Bahr on the question of actual malice as to Bosie.

Affirmed in part, reversed in part, and remanded.