Daniel L. WILLIS, Respondent,

v.

INDIANA HARBOR STEAMSHIP CO., L.L.C., a foreign limited liability company, et al., Appellants,

and

Indiana Harbor Steamship Co., L.L.C., et al., defendants and third party plaintiffs, Appellants,

v.

Duluth, Missabe and Iron Range Railway Company, third party defendant, Respondent.

No. A09–2223.

Court of Appeals of Minnesota.

Oct. 19, 2010.

178

Steven S. Eckman, Eckman, Strandness & Egan, P.A., Wayzata, MN, for respondent Daniel J. Willis.

Joseph V. Ferguson, Paul W. Wojciak, Johnson, Killen & Seiler, Duluth, MN; and Robert T. Coniam (pro hac vice), Ray Robinson Carle & Davies, P.L.L., Cleveland, OH, for appellants Indiana Harbor Steamship Co., Central Marine Logistics, Inc., ArcelorMittal USA, Inc., and ArcelorMittal Minorca Mine, Inc.

Diane P. Gerth, Alfonse J. Cocchiarella, Ricke & Sweeney, P.A., St. Paul, MN, for respondent Duluth, Missabe and Iron Range Railway Company.

Considered and decided by MINGE, Presiding Judge; JOHNSON, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.*

Appellants Indiana Harbor Steamship Co., Central Marine Logistics, Inc., ArcelorMittal USA, Inc., and ArcelorMittal Minorca Mine, Inc. appeal from judgment following a jury verdict in favor of respondent Daniel J. Willis on his negligence claims brought under the Jones Act, 46 U.S.C. § 30104 (2006). Appellants challenge (1) a negative-inference jury instruction based on spoliation; (2) the determination that the liability and apportionment of damages were governed by Minnesota law rather than federal maritime law; (3) the amount of damages awarded for past lost wages; (4) the amount of damages awarded for future losses; (5) the determination that appellants were governed by a provision in a contract between the dock owner and the entity contracting for transportation, rather than by the federal maritime warranty of workmanlike performance; (6) the denial of a request to determine collateral sources under Minn. Stat. § 548.251 (2008); and (7) the application of an incorrect rate for postjudgment interest. Because we conclude that appellants' challenges to the damages awards are without merit but that the negative-inference instruction was reversible error, we affirm in part, reverse in part, and remand.

## FACTS

On August 27, 2004, while working as a crewman of the vessel *Joseph L. Block*, Willis was injured on a dock in the Duluth harbor owned by respondent Duluth, Missabe & Iron Range Railway Company (DM&IR). Willis was handling one of the *Block's* mooring lines used to secure the vessel when he slipped on the dock and fell. Willis testified that at the place where he fell the dock was covered by a slime of water and limestone, and that his knee hit both the dock and taconite pellets that were obscured by the milky limestone mixture. Willis eventually was diagnosed with deep vein thrombosis stemming from the injury to his knee.

Willis sued his employers, Indiana Steamship and Central Marine, under the Jones Act, claiming entitlement to maintenance and cure as well as additional compensation for his injuries under a negligence theory. Indiana Steamship impleaded DM&IR under the theory that DM&IR, as the dock owner, was liable due to the dangerous condition of the dock. Willis later amended the complaint to add DM&IR as a direct defendant, as well as to assert claims against the *Block's* charterer, ArcelorMittal USA, Inc., and the owner of the taconite manufacturing facility for which the cargo of

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

the *Block* was destined, ArcelorMittal Minorca Mine, Inc. The district court ruled that all defendants except DM&IR were a unitary enterprise and that their fault as "vessel defendants" should be aggregated. The district court also ruled that the contract for contribution between DM&IR and ArcelorMittal Minorca Mine applied and superseded common-law concepts of contribution between DM&IR and the vessel defendants.

At trial, evidence was presented that the *Block* arrived at the dock at approximately 2 p.m. on August 27, 2004. Another vessel, the *Callaway*, had occupied the dock prior to the arrival of the *Block* and departed shortly after it finished unloading its cargo at 12:45 p.m. Because the *Callaway's* cargo did not include taconite pellets, there was testimony that any such pellets on the dock where Willis fell must have been there since before the *Callaway* docked that morning at approximately 2 a.m. The rulebook governing dock policies and procedures at the time required that docks be cleaned prior to vessel arrival and, in the event that they could not be cleaned, that the vessel be notified of their condition. According to a dock foreman, there had not been time between the *Callaway's* departure and the *Block's* arrival to properly clean the dock. Although the dock foreman confirmed DM&IR's policy to inform the vessel's captain if the dock was not cleaned, the foreman could not recall any instance in his 36 years' experience when a vessel was told to delay docking because of a spill on the dock or when a vessel has refused to dock because of a spill.

The foreman also testified that no accident was reported on the day Willis slipped and fell on the dock. According to the foreman, had the accident been reported, DM&IR would have investigated the incident, taking statements and documenting the condition of the dock at the time of the accident. The accident occurred on a Friday and, although Central Marine Logistics was informed of the accident on that afternoon, DM&IR was not notified of the incident until the following Monday. In light of this late notice, the district court gave a negative-inference jury instruction as a sanction based on its interpretation of the doctrine of spoliation.

The jury returned a verdict in favor of Willis in the total sum of $1,818,898, finding that Willis was entitled to compensation for $281,468 in past lost wages, $50,000 for past pain and suffering, $962,430 for future lost wages, $500,000 for future medical costs, and $251,000 for future pain and suffering. The jury apportioned 85% of the causal fault for the accident to the vessel defendants, 7.5% to DM&IR, and 7.5% to Willis. The district court ordered judgment accordingly. Appellants sought posttrial relief, which the district court denied in all respects, and this appeal followed.

## ISSUES

I. Was the negative-inference jury instruction as a sanction for spoliation prejudicial error?

II. Did the district court err in determining that Minnesota premises-liability law applied to appellants?

III. Did the district court abuse its discretion in denying remittitur on the damages award for past lost wages?

IV. Did the district court abuse its discretion in denying appellants a new trial on future damages?

V. Did the district court err in applying the contractual contribution clause?

VI. Did the district court err in denying appellants' motion for determination of collateral sources?

VII. Did the district court apply the wrong rate of postjudgment interest on the verdict award?

## ANALYSIS

### I.

Appellants first argue that the negative-inference jury instruction based on spoliation was unwarranted under Minnesota law and unfairly prejudiced appellants on both liability and apportionment of that liability, and therefore that the district court abused its discretion in failing to grant appellants a new trial. A party may seek a new trial when there are errors of law at trial or when a party is deprived of a fair trial due to irregularities in the proceedings. Minn. R. Civ. P. 59.01(a), (f). Because the district court has the discretion to grant a new trial, appellate courts will not disturb the decision "absent a clear abuse of that discretion." *Halla Nursery, Inc. v. Baumann–Furrie & Co.*, 454 N.W.2d 905, 910 (Minn. 1990).

The term "spoliation" generally refers to the destruction of relevant evidence by a party. *Foust v. McFarland*, 698 N.W.2d 24, 30 (Minn.App.2005), *review denied* (Minn. Aug. 16, 2005). "On review, an appellate court considers whether the district court is authorized to impose a sanction for spoliation of evidence and, if so, whether it abused its discretion by imposing such a sanction." *Wajda v. Kingsbury*, 652 N.W.2d 856, 860 (Minn. App.2002) (citing *Patton v. Newmar Corp.*, 538 N.W.2d 116, 118 (Minn.1995)), *review denied* (Minn. Nov. 19, 2002). The district court has broad authority in determining what, if any, sanction is to be imposed for spoliation of evidence. *Patton*, 538 N.W.2d at 119.

Although *Black's Law Dictionary* 1531 (9th ed.2009) defines spoliation as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence," Minnesota courts have held that spoliation does not have to be intentional to constitute obstruction of justice deserving of a sanction. *Wajda*, 652 N.W.2d at 862. Regardless of intent, disposal of evidence may be subject to a spoliation sanction when a party knows or should know that the evidence should be preserved for pending or future litigation. *Patton*, 538 N.W.2d at 118. As a spoliation sanction Minnesota "permits 'an unfavorable inference to be drawn from failure to produce evidence in the possession and under the control of a party to litigation.'" *Federated Mut. Ins. Co. v. Litchfield Precision Components, Inc.*, 456 N.W.2d 434, 436–37 (Minn.1990) (quoting *Kmetz v. Johnson*, 261 Minn. 395, 401, 113 N.W.2d 96, 100 (1962)).

Appellants argue that, because they lacked control over the dock and its condition, they cannot be subject to a spoliation sanction for changes to the condition of the dock after the accident. There is nothing in the record that indicates that appellants had any control of the dock or when the dock was cleaned. The only party who had control over the dock or would have cleaned the dock, and thus destroyed the spill evidence, was DM&IR. The district court, however, concluded that a spoliation-based negative-inference instruction was appropriate despite the fact that appellants never had control over the dock or the condition related to the spill. In its posttrial order, the district court justified "the instruction on spoliation of evidence," stating "[t]he fact of [Willis's] fall, and the condition of the dock at the place and time, were within the exclusive knowledge, and therefore the exclusive control and possession, of the vessel Defendants" and because there was evidence that the vessel defendants failed to notify DM&IR of the

injury when it occurred, DM&IR was "prejudiced because it could not inspect or document the location of Plaintiff's fall because the conditions of the dock regularly change."

■ Although we generally respect a district court's broad discretion regarding jury instructions and the determination of an appropriate sanction for spoliation, we review separately whether a spoliation sanction was authorized. *Wajda*, 652 N.W.2d at 860. Without citation to precedential caselaw, DM&IR argues that sanctions should be imposed regardless of control when a party knowingly allows evidence to dissipate. But our relevant caselaw involves only evidence that was under the control of the party sanctioned. *See, e.g., Patton*, 538 N.W.2d at 118 (addressing loss of plaintiff's allegedly defective motor home and loss of parts retained by the plaintiffs' expert); *Wajda*, 652 N.W.2d at 864 (addressing destruction of tapes under the exclusive control of an adverse party); *Hoffman v. Ford Motor Co.*, 587 N.W.2d 66, 68 (Minn.App. 1998) (addressing destruction of fire scene and its contents and alteration of allegedly defective vehicle, all in possession of plaintiff). The unpublished case cited by DM&IR, *Huhta v. Thermo King Corp.*, No. A03–1961, 2004 WL 1445540 (Minn. App. June 29, 2004), does not support the theory that a party can be sanctioned for the destruction of evidence over which the party never had control. Our caselaw has not extended the reach of a spoliation sanction to a party who has had no physical control over the evidence, and we decline to extend the reach of spoliation sanctions here. Because the record clearly shows that appellants never had actual control over the dock and because physical control is necessary for a spoliation sanction, we conclude that the sanction for spoliation was not authorized.

■ The determination that the sanction was not authorized does not end our inquiry. We must next determine if the negative-inference instruction substantially prejudiced appellants. Error in a jury instruction is likely to be considered fundamental, and therefore not harmless, if the error destroys the substantial correctness of the entire jury charge, results in a miscarriage of justice, or substantially prejudices a party. *Lindstrom v. Yellow Taxi Co. of Minneapolis*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974). The right to a fair trial is among a party's substantial rights. *See, e.g.*, Minn. Const. art. I, § 8 (stating that a party is entitled to "obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws"). "If a jury instruction 'is erroneous and an appellate court is unable to determine whether the error affected the jury, a new trial should be granted.'" *Youngquist v. W. Nat'l Mut. Ins. Co.*, 716 N.W.2d 383, 385–86 (Minn.App.2006) (quoting *Rowe v. Munye*, 674 N.W.2d 761, 769 (Minn.App.2004), *aff'd*, 702 N.W.2d 729 (Minn.2005)).

The instruction read:

If evidence that could reasonably be expected to have been produced, but is not produced due to the actions or inactions of a party that prejudice another party, and the party whose actions allowed the evidence to have been altered fails to give a reasonable explanation, you may decide that the evidence would have been unfavorable to that party.

Willis argues that this instruction is harmless because the instruction allows the jury to determine if evidence was allowed to be altered and who allowed it to be altered. But the only party to proffer testimony and argue destruction of evidence was DM&IR. DM&IR elicited testimony that appellant Central Marine Logistics knew

of the accident on Friday, failed to report it to DM&IR until Monday, and that such actions prevented DM&IR from timely investigating the conditions of the dock. DM&IR clearly developed the record to support a jury's finding of a negative inference against appellants and DM&IR argued that appellants allowed the evidence to be altered in their closing argument.

Much was made at trial about the condition of the dock, especially on the issue of the presence of taconite pellets. If there were taconite pellets present, appellants would have a much stronger argument that DM&IR failed in its duty to properly clean the dock. The negative-inference instruction invited the jury to draw an inference against the vessel defendants regarding the condition of the dock. While we agree that either party is free to argue about the significance of the appellants' failure to promptly notify DM&IR of Willis's slip and fall, the district court's decision to grant a sanction in the form of a negative-inference instruction places the court's authority behind the negative inference. Because we cannot conclude that the negative-inference instruction did not prejudice appellants' substantial right to a fair trial, and because we have concluded above that the instruction was not authorized, we reverse the jury's apportionment of liability and remand for a new trial on liability and the apportionment of the causal fault.

## II.

Appellants next argue that the district court erred in determining that the liability and apportionment were governed by Minnesota premises-liability law rather than federal maritime law. Willis argues that appellants are prohibited from raising this argument on appeal because it was not raised in appellants' posttrial motions. The district court gave the jury an instruction on Minnesota premises-liability law,

over appellants' objection, concluding that Minnesota premises-liability law applied to Willis's claims against the vessel defendants as well as those against DM&IR. This specific premises-liability jury instruction was not challenged in appellants' posttrial motions.

The Minnesota Supreme Court has recognized the longstanding rule "that matters such as trial procedure, evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn. 1986); *see also Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 309 (Minn.2003) (citing *Sauter* and reaffirming the longstanding rule). In contrast, when substantive questions of law are raised and considered in the district court, a motion for a new trial pursuant to Minn. R. Civ. P. 59.01 is not a prerequisite for appellate review. *Alpha Real Estate*, 664 N.W.2d at 311. Although this dispute arose in the context of instructing the jury, determining what law to apply presents a legal question. *Christian v. Birch*, 763 N.W.2d 50, 56 (Minn. App.2009). Thus, we conclude that this issue has not been waived.

State courts generally are bound to apply federal maritime law in cases brought under the Jones Act. *See Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384, 38 S.Ct. 501, 504, 62 L.Ed. 1171 (1918) (holding that the rights of a seaman injured while in service of the ship must be measured according to rules of maritime law); *see also Soderstrom v. Curry & Whyte*, 143 Minn. 154, 156, 173 N.W. 649, 649 (1919) (holding that "Congress has paramount power to fix and determine the maritime law of the land"). But this general rule does not apply to claims asserted

against the dock owner for injuries sustained on a dock. In *Victory Carriers, Inc. v. Law,* the Supreme Court stated:

> More precisely, the threshold issue is whether maritime law governs accidents suffered by a longshoreman who is injured on the dock by allegedly defective equipment owned and operated by his stevedore employer. We hold that under the controlling precedents, federal maritime law does not govern this accident. Nor, in the absence of congressional guidance, are we now inclined to depart from prior law and extend the reach of the federal law to pier-side accidents caused by a stevedore's pier-based equipment.

404 U.S. 202, 204, 92 S.Ct. 418, 420–21, 30 L.Ed.2d 383 (1971). Our case, however, is distinguishable from *Victory Carriers* because the issue here is not just whether DM&IR is liable, but also whether the vessel defendants are liable.

■■■ When injury is caused by a vessel, admiralty law applies regardless of where the injury occurred. *See* 46 U.S.C. § 30101 (2006) ("The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."). The Jones Act states:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104. Because this case is brought under the Jones Act, and because the Jones Act specifically states that the laws of the United States apply to Jones Act claims, the federal maritime standard of premises liability applies since it is substantive, not procedural, law. *See also Garrett v. Moore–McCormack Co.,* 317 U.S. 239, 244, 63 S.Ct. 246, 250, 87 L.Ed. 239 (1942) ("This Court has specifically held that the Jones Act is to have a uniform application throughout the country unaffected by local views of common law rules.") (quotation omitted). Accordingly, we conclude that the district court incorrectly instructed the jury on Minnesota premises-liability law regarding the liability of the vessel defendants.

### III.

■■■ Appellants argue that the jury's award of damages for past wage loss was not supported by the evidence. A district court may grant a new trial because of excessive damages that appear to have been given under the influence of passion or prejudice or are not justified by the evidence. Minn. R. Civ. P. 59.01(e), (g). A district court possesses "the broadest possible discretion in determining whether a new trial should be granted for excessive damages." *Bisbee v. Ruppert,* 306 Minn. 39, 48–49, 235 N.W.2d 364, 371 (1975). An appellate court will not reverse the grant or denial of a motion for remittitur unless there was "a clear abuse of discretion." *Kwapien v. Starr,* 400 N.W.2d 179, 184 (Minn.App.1987).

The district court denied appellants' motion for remittitur, noting that the vessel defendants "admit that the award for past wage loss was in the range that [Willis's financial expert] testified to" and concluding that the weight of the testimony was an issue for the jury and that the award was not contrary to the evidence. Willis's financial expert, Dr. Sherman, testified that Willis lost wages in the amount of $267,022. This amount was based on Dr.

Sherman's assumption that there would be a 15% bonus resulting in $337,150 in total lost income, which would be reduced by $70,127 in taxes. But Dr. Sherman conceded on cross examination that the 15% bonus required winter-month sailing, and that the regular-season-sailing bonus was only 10%. In light of this concession, appellants argue it was an abuse of discretion to deny remittitur.

The jury awarded $281,468 in past lost wages. Although this award is not precisely the amount recommended by Dr. Sherman, we agree with the district court that it is within the range supported by Dr. Sherman's testimony. Because the jury verdict on past wages is not significantly outside of the recommended past wages amount, we cannot conclude that the district court abused its broad discretion in denying remittitur or a new trial on past lost wages.

## IV.

 The fourth issue is whether the district court abused its discretion in failing to grant appellants a new trial on future damages. In a civil action the plaintiff has the burden of proving, by a preponderance of the evidence and to a reasonable certainty, the amount of future damages. *Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn.1980). "Ordinarily, the question of whether a motion for a new trial on the ground of excessive damages should be granted or whether the verdict should be reduced rests in the practical judgment and sound discretion of the trial court." *DeWitt v. Schuhbauer*, 287 Minn. 279, 286, 177 N.W.2d 790, 795 (1970). An appellate court may set aside a verdict when it is so excessive that it could only be the result of passion or prejudice, or when the award is the result of speculation rather than the evidence presented at trial. *Fifer v. Nelson*, 295 Minn. 313, 318, 204

N.W.2d 422, 425 (1973). An award may be speculative when the evidence presented at trial provides only vague information about future damages. *See Lind v. Slowinski*, 450 N.W.2d 353, 358 (Minn.App.1990) (vacating future damages award based on vague testimony that plaintiff will need "sporadic" care or "medical attention once in a while"), *review denied* (Minn. Feb. 21, 1990).

Appellants argue that, though Dr. Sherman testified to lost earnings capacity in the range found by the jury, the award was born of speculation. Appellants' speculation argument appears to be based on evidence, presented to the jury, that Willis's employment history contains significant periods of unemployment. The jury was given this information to consider, but there was nothing to indicate that Willis would not have continued his employment as a seaman. Dr. Sherman testified that the range for lost future earnings was between $1,437,404 and $1,629,251. The jury awarded $962,430 in lost future earnings, an amount below the range testified to by Dr. Sherman. Accordingly, we conclude that the district court did not abuse its discretion in denying appellants' motion for a new trial based on the future-earnings award.

 Appellants argue that the award of future medical expenses also was speculative. They contend that the award of $500,000 in future medical expenses must have been based on future nursing-home care, the need for which is too speculative to justify the award. Instead, appellants argue, the amount testified to by their expert, $293,265.02, more accurately predicts Willis's future medical costs, including costs of blood-thinning and other medications, compression stockings, pain relief, Doppler studies, and periodic physician visits. In contrast, Dr. Sherman testified

that Willis's future medical costs would be between $907,751 and $1,102,495.

Dr. Sherman's testimony was based on the necessary medical expenses testified to by Linda Graham, a registered nurse and life-care planner. Graham testified that she made her determinations of expected future medical needs based on an examination of Willis's medical records, a report from his treating physician, the depositions of the other medical experts, and an interview with Willis. Graham testified to many of the medical needs testified to by DM&IR's expert, but also focused on Willis's home-care needs. According to Graham, Willis's girlfriend was providing home care four hours per day, and Willis would need a home health aide's help were his girlfriend not available. Graham also testified about possible intermittent nursing-home placement due to complications, but that "the hope is that he won't need that." Assuming that all care was done at home, Graham testified that the "lower end of the range [of lifetime cost] is $1,252,891." This amount did not include nursing-home care.

Because the award of future medical expenses was supported by the testimony of Dr. Sherman and Graham, because the award was well below the range testified to by both Dr. Sherman and Graham, and because the weighing of conflicting evidence is an issue for the jury, *Reinhardt v. Colton,* 337 N.W.2d 88, 96 (Minn.1983), the district court did not abuse its discretion in denying appellants' motion for a new trial based on the future-medical-expenses award.

## V.

The fifth issue is whether the district court erred in applying the written contribution clause in the transportation contract. Section 13 of the transportation contract between DM&IR and ArcelorMit-

tal Minorca Mine states that the Minorca Mine accepts responsibility for "negligence of [c]ompany, its agents or employees acting pursuant to this contract." The contract further states "[s]hould [r]ailroad and/or [c]ompany suffer any harm through the joint negligence of company and railroad acting pursuant to this [c]ontract, such expenses will be apportioned between the parties in proportion to their negligence." The district court concluded that the vessel defendants were agents and that the joint-negligence contract language thus applied to all vessel defendants.

### a. Operation of the maritime warranty of workmanlike performance

■ Appellants argue that, even if the contribution clause applies, the warranty of workmanlike performance also applies. In *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.,* the Supreme Court ruled that stevedores, or dockworkers, and other contractors give shipowners an implicit warranty that their services will be performed in a "workmanlike" manner. 350 U.S. 124, 133, 76 S.Ct. 232, 237, 100 L.Ed. 133 (1956). It concluded that the "warranty of workmanlike service" is comparable "to a manufacturer's warranty of the soundness of its manufactured product," and requires stevedores and other contractors to perform services with a reasonable level of "[c]ompetency and safety." 350 U.S. at 133–34, 76 S.Ct. at 237. A failure to provide a reasonable level of competency and safety then "constitutes a breach of contract and provides shipowners with a right to indemnification for foreseeable loss resulting therefrom." *Vierling v. Celebrity Cruises, Inc.,* 339 F.3d 1309, 1315–16 (11th Cir.2003) (citing *Ryan,* 350 U.S. at 132–35, 76 S.Ct. at 236–38). This warranty has been extended to run "from a wharfinger, or dockowner, to a shipowner." *Id.* at

1316. A shipowner is entitled to indemnity when a breach of the warranty of workmanlike performance results in loss or harm, "absent conduct on [the shipowner's] part sufficient to preclude recovery." *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491 (1958).

Recent caselaw, however, indicates a trend away from *Ryan* indemnity. In the Ninth Circuit case *Knight v. Alaska Trawl Fisheries, Inc.*, the court adopted the rationale of other circuits that have abandoned *Ryan* indemnity in favor of comparative fault in seamen personal-injury cases. 154 F.3d 1042, 1046 (9th Cir.1998) (citing *Smith & Kelly Co. v. S/S Concordia TADJ*, 718 F.2d 1022, 1028–29 (11th Cir. 1983); *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493, 500 (5th Cir.1982)); *see also Black v. Red Star Towing & Transp. Co.*, 860 F.2d 30, 34 (2d Cir.1988) (declining to apply *Ryan* warranty to a single transaction between shipowner and contractor and applying comparative fault to liability for maintenance and cure). The *Knight* court noted that "the trend in maritime law is to impose a duty of care on all parties to avoid accidents." 154 F.3d at 1046. We find these recent cases persuasive. Thus, we conclude that the district court did not err in refusing to apply *Ryan* indemnity or the maritime warranty of workmanlike performance.

### b. Evidence of agency status

 Appellants argue that the district court erred in finding that appellants were all agents for the purpose of the contract. Because the Jones Act incorporates the standards of the Federal Employers' Liability Act (FELA), the agency principles outlined in *Sinkler v. Missouri Pac. R.R. Co.*, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958), apply to Jones Act claims. *See Hopson v. Texaco, Inc.*, 383 U.S. 262, 263–64, 86 S.Ct. 765, 766, 15 L.Ed.2d 740 (1966) (citing *Sinkler* in the context of a Jones Act claim). The court in *Hopson* noted that *Sinkler* affirmed that FELA "was an avowed departure from the rules of the common law . . . which, recognizing the cost of human injury, an inescapable expense of railroading, undertook to adjust that expense equitably between the worker and the carrier." *Hopson*, 383 U.S. at 263–64, 86 S.Ct. at 766 (quotations omitted). To give an accommodating scope to the word "agents," the Court in *Sinkler* held that when an "employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA." 356 U.S. at 331–32, 78 S.Ct. at 763.

In its posttrial order, iterating that it did not err in finding that the four vessel defendants were agents, the district court explained:

> ArcelorMittal USA is the parent company and actively participated in, exercised control over, and worked alongside its subsidiaries, including Minorca Mine. Defendants argue that *Sinkler* agency only applies to delegation of operational activities of employers. However, closeness and entanglement of the various companies can lead to no other conclusion than that the [four] are engaged in furthering the operational activities of each other. The ability of ArcelorMittal USA to control the other [three] entities supports this conclusion. Further, the vessel Defendants failed to correctly identify themselves or their respective roles in this matter, leading to a continuation of the initial trial date on the eve of trial. Without meaningful disclosure by these defendants, the Court was left to conclude that the [four] vessel defendants were agents.

Under the *Sinkler* definition of agency used in Jones Act claims, we conclude that the district court's determination of agency is supported by the record. The record shows that the vessel operated by Indiana Harbor and Central Marine was sailing and docking at the DM&IR dock for the purpose of delivering limestone to Minorca Mine. This record indicates that ship and shipping company were acting under agreement with Minorca Mine to deliver the limestone, and such an arrangement fits squarely within the *Sinkler* agency definition. Appellants argue that *Sinkler* works to preclude the finding of agency because Minocra Mine did not delegate any "operational activities" to any of the vessel defendants. While we acknowledge that the record is not well developed on the issue of what constitutes an "operational activity" of Minorca Mine, we note that the record supports the district court's conclusion that the vessel defendants were working as a unitary enterprise.

### c. Finding of a "unitary enterprise"

■ Appellants also argue that the district court erred in concluding that the vessel defendants were engaged in a "unitary enterprise." The district court concluded that the "closeness and entanglement of the various companies can lead to no other conclusion than that the [four] are engaged in furthering the operational activities of each other." DM&IR argues that the testimony of Daniel Cornillie supports the district court's conclusion that the vessel defendants were a unitary enterprise. Cornillie was employed by ArcelorMittal at Indiana Harbor as the manager of marine and raw materials, and logistics. His testimony supports the conclusion that (1) the relationship between ArcelorMittal USA and the owner of the *Block*, Indiana Harbor, is exclusive; (2) ArcelorMittal USA has extensive control over the movements and management of the ship; and (3) ArcelorMittal USA pays many of the bills related to the operation of the vessel. This evidence supports the district court's conclusion that Indiana Harbor, ArcelorMittal USA, and Central Marine Logistics were a unitary enterprise.

A closer question is whether Indiana Harbor, ArcelorMittal USA, and Central Marine Logistics were a unitary enterprise with the ArcelorMittal Minorca Mine. DM&IR argues that, because the three shipping parties were working with the ArcelorMittal Minorca Mine with the "overarching" purpose of transporting limestone, they were all engaged in a unitary enterprise. The record contains testimony supporting the district court's conclusion that ArcelorMittal Minorca Mining was part of a unitary enterprise with ArcelorMittal USA as subunits of ArcelorMittal Mining in Europe. Based on this testimony, the district court did not abuse its discretion in determining that the four appellants were a unitary enterprise, and the district court did not err in applying the contribution clause.

### d. Minorca Mine as a vessel defendant

■ Appellants argue that ArcelorMittal Minorca Mine was entitled to JMOL on all of Willis's claims because it was not a "vessel defendant." Appellate courts review de novo a district court's denial of a Rule 50 motion for JMOL. *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn.2009). "JMOL is appropriate when a jury verdict has no reasonable support in fact or is contrary to law." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn.App.2007) (citing *Diesen v. Hessburg*, 455 N.W.2d 446, 452 (Minn. 1990)); *see also* Minn. R. Civ. P. 50.01(a). When reviewing a denial of a motion for

JMOL, the evidence is viewed in the light most favorable to the prevailing party. *Bahr*, 766 N.W.2d at 919.

The district court determined that the ArcelorMittal Minorca Mine was a vessel defendant based on the "unitary enterprise" theory. Appellants argue that ArcelorMittal Minorca Mine is only liable under the contract it signed with DM&IR and that, because appellants argue that the district court erred in finding the vessel defendants a "unitary enterprise," there should be no liability under the agency principles in the contract. DM&IR argues that this determination of liability was appropriate based on the interrelatedness of the vessel defendants and the fact that each served as a "link in the chain of production." Because we conclude that there was record support for the "unitary enterprise" finding by the district court, and that such a finding supports a conclusion that the liability provision in the contract involving agents would apply, we conclude that the district court did not err in denying JMOL on this issue.

## VI.

The sixth issue is whether the district court erred in denying appellants' motion for a determination of collateral sources. Appellants sought a collateral-source offset under Minn.Stat. § 548.251, subd. 1 (2008). "When an individual or entity other than a tortfeasor compensates a tort plaintiff for his or her injuries, the plaintiff has received a 'collateral-source benefit.'" *Swanson v. Brewster*, 784 N.W.2d 264, 268 (Minn.2010). The legislature changed the common-law rule on collateral sources and damage awards when it adopted Minn.Stat. § 548.251, "essentially providing that a plaintiff cannot recover money damages from the defendant if the plaintiff has already received compensation from certain third parties or entities." *Id.* at 269.

Willis first argues that appellants are not entitled to a collateral-source offset because appellants' payments were a direct, and not collateral, source of payments. *See Do v. Am. Family Mut. Ins. Co.*, 779 N.W.2d 853, 859 (Minn.2010) (stating that the statutes, the definition of collateral sources means "a source unrelated to and unconnected with the tortfeasor."). While this is a correct statement of Minnesota law regarding collateral-source offsets, it does not address the issue of double recovery for past wages under the Jones Act, which requires payment of "maintenance and cure" independent of any lost-wage award.

The district court concluded that, because all of appellants' prior payments to Willis, totaling $200,339.37, were properly characterized as maintenance and because Willis "received no award for past medical expense, there is nothing to offset." Appellants argue that the district court's characterization of the $200,339.37 as maintenance was error because the required maintenance rate, as established in the union contract, was $8.00 per. day or $56.00 per week. Appellants argue that they therefore paid supplemental-wage compensation of $187,123.37 above the maintenance rate required by the collective bargaining agreement and that the award of past wages should be reduced by that amount.

"Maintenance and cure" refers to the duty the owner of a vessel has under admiralty law to compensate a seaman for food and lodging, and to pay for necessary medical expenses if the seaman becomes ill or is injured in the service of the vessel. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527–28, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938); *Associated Elec. Coop., Inc. v. Mid–Am. Transp. Co.*, 931 F.2d 1266, 1268

n. 2 (8th Cir.1991). "Maintenance and cure" is a duty arising from the contract of employment, and does not depend on the negligence or culpability of the owner. *Stanislawski v. Upper River Servs., Inc.*, 6 F.3d 537, 540 (8th Cir.1993) (citing *Calmar S.S. Corp.*, 303 U.S. at 527, 58 S.Ct. at 652). Because it is a separate, contractual duty, "a seaman is entitled to 'maintenance and cure' payments in addition to any damages for negligence he or she might win under the Jones Act." *Id.*

In *Stanislawski*, the Eighth Circuit addressed a similar issue regarding double compensation for lost wages. There, the plaintiff received checks from the defendant prior to trial that totaled $13,840. *Id.* The defendant argued that the checks represented "payments of $55 per day: $20 for maintenance and $35 in voluntary supplemental wage compensation." *Id.* Although the plaintiff argued that the entire $55 was for maintenance, the district court found that $35 was for supplemental wages and, based on an affidavit supporting the district court's finding, the Eighth Circuit affirmed the district court's conclusion and reduced by $8,680 the original past-wage award on the ground that it constituted double payment. *Id.*

Willis argues the district court's decision to disregard the $8.00 per day amount and find that the pretrial payments were entirely maintenance is a finding of fact and should be reviewed for clear error. The Ninth Circuit, in a divided opinion, held that the collectively bargained rate of $8.00 a day is binding on the seaman notwithstanding the district court's finding that the rate is inadequate to obtain food and lodging. *Gardiner v. Sea–Land Serv., Inc.*, 786 F.2d 943, 949 (9th Cir.1986). Other circuits have followed that lead. *See Ammar v. United States*, 342 F.3d 133, 146 (2nd Cir.2003); *Cabrera Espinal v. Royal Caribbean Cruises, Ltd.*, 253 F.3d 629, 631 (11th Cir.2001); *Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir.1989); *Al–Zawkari v. Am. S.S. Co.*, 871 F.2d 585–588 (6th Cir.1989). However, the Third Circuit has held that, in light of the purpose of maintenance, the court should not be bound by the amount established in a collective bargaining agreement. *Barnes v. Andover Co.*, 900 F.2d 630, 640 (3d Cir.1990). There is no Eighth Circuit case which has examined whether a seaman is bound by the contractual-maintenance provision.

Because the circuits are split and there is no Supreme Court case resolving this issue, this court is not bound by any circuit court's rationale. We note that the district court, in finding the payments were in the form of maintenance, relied on the fact that the payments were not designated as supplemental wages distinct from maintenance. This failure to distinguish maintenance from supplemental wages, in conjunction with statements from a corporate representative that the payments were wages in the form of maintenance, supports the district court's determination that these payments were in the form of maintenance and not supplemental income. In light of the purpose of maintenance and the fact that the payments were treated as maintenance prior to trial, we conclude that the district court's finding that appellants' pretrial payments were maintenance was not clear error.

## VII.

Finally, appellants argue that the district court erred in applying the wrong statute governing postjudgment interest on the damages award. Because we reverse and remand for a new trial on liability and the apportionment of the causal fault based on the erroneous spoliation sanction, we need not reach the issue of the appropriate postjudgment interest.

## DECISION

We affirm the district court's decisions to (1) deny JMOL, a new trial, or remittitur on the issue of damages; (2) deny appellants' preference to apply the indemnity provision of the maritime warranty of workmanlike performance over the apportionment-of-negligence provision in the transportation contract; (3) deny appellants' motion for JMOL on the claims against ArcelorMittal Minorca Mine; and (4) deny appellant's motion for a collateral-source offset. But because we conclude that the district court prejudicially erred in granting a spoliation sanction for the destruction of evidence that was never in appellants' control, we reverse and remand for a new trial on liability and the apportionment of the causal fault. In the new trial, we direct the district court to properly instruct the jury on the federal maritime premises-liability law regarding the liability of the vessel defendants.

**Affirmed in part, reversed in part, and remanded.**