*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1835**

R. Wynn Kearney, Jr., M.D.,
Appellant,

vs.

The Orthopaedic and Fracture Clinic, P.A.,
Respondent,

vs.

Steven B. Curtis, et al, intervening defendants and counterclaimants,
Respondents.

**Filed September 8, 2015
Affirmed
Rodenberg, Judge**

Blue Earth County District Court
File No. 07-CV-13-1832

James H. Gilbert, Beverly J. Aho, Adam L. Sienkowski, James H. Gilbert Law Group, P.L.L.C., Eden Prairie, Minnesota (for appellant)

Laurel J. Pugh, Steven P. Aggergaard, Casey D. Marshall, Bassford Remele, P.A., Minneapolis, Minnesota (for respondents)

Considered and decided by Reyes, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

**RODENBERG**, Judge

Appellant challenges the district court's grant of summary judgment in favor of respondent on appellant's tort and reprisal claims, and on his claims for statutory relief. He also challenges the district court's evidentiary rulings at trial and the district court's determination that neither party was a prevailing party. Respondent, by cross-appeal, challenges the district court's denial of its motion for judgment as a matter of law (JMOL) and also challenges evidentiary rulings at trial. We affirm.

**FACTS**

This case arises from a dispute between appellant R. Wynn Kearney, Jr., M.D., and his former employer, respondent/cross-appellant Orthopaedic and Fracture Clinic, P.A. (OFC). Appellant is an orthopaedic surgeon and a former OFC shareholder. He sued OFC after OFC terminated his employment and offered to buy his shares in the clinic under a Restated Stock Purchase Agreement (RSPA) for $5,906.

Appellant was employed by OFC as a physician and surgeon between 1972 and 2012.[1] Appellant signed an employment agreement with OFC in 1977 and a deferred compensation agreement in 1979.[2] Appellant purchased shares of OFC in 1979 and signed a stock purchase agreement. Effective January 1, 2003, appellant and OFC executed the RSPA. All physician shareholders are on the board of directors of OFC and

---

[1] Appellant served in the Navy between 1973 and 1975, but returned to OFC in 1976 and was employed there until his termination in 2012.
[2] Appellant executed a new employment agreement in 1990. All of the provisions relevant to this appeal remained materially unchanged in the 1990 agreement.

rotate officer positions annually. Appellant served on the board and as an officer of OFC during his employment.

In 2005, appellant participated in a "slow down policy" under which he was not required to perform call duty.[3] In 2008, appellant began suffering from anxiety. He sought treatment, but did not inform OFC of his diagnosed anxiety or of his treatment for it. In 2009, appellant commenced this action,[4] but the suit remained unfiled until 2013.[5]

In 2011, appellant returned to full-time work, including taking call duty. On February 23, 2011, after appellant had taken approximately six weeks of call duty, appellant's doctors sent a letter informing OFC that appellant suffered "from medical conditions which preclude him from performing call duties" indefinitely. The letter did not identify the specific medical conditions from which appellant suffered, and the OFC executive committee was concerned about whether appellant could safely and

---

[3] OFC surgeons are ordinarily required to take "call duty," which "refers to physicians answering emergency or other unscheduled patient services and appointments at any time." OFC has an exemption to this requirement, called a "slow down policy" where physicians nearing retirement may work full-time, but need not take call duty. After two years under the "slow down policy," the physician may retire, return to full-time work including call duty, or seek employment as a contract physician with OFC. In 2007, the slow-down policy was amended. Appellant filed an age discrimination charge in 2008 concerning the slow-down policy change, but that issue is not before us on appeal.

[4] Appellant moved the court to amend and supplement the complaint in 2013, and the district court granted the motion on August 28, 2013.

[5] Appellant also filed charges with the Minnesota Department of Human Rights (age discrimination on September 10, 2008) and with the Equal Employment Opportunity Commission (disability discrimination on May 27, 2012).

3

competently perform his non-call duties. OFC placed appellant on indefinite leave on February 26, 2011,[6] and sought additional information from appellant and his doctors.

In February 2012, appellant underwent an independent medical examination (IME). The IME examiner concluded that appellant could perform call duty, but only during the daytime. On April 5, 2012, OFC informed appellant that he must return to a full-time schedule with call duty limited to the hours of 8:00 a.m. to 8:00 p.m. On April 12, 2012, appellant informed OFC he would not act against his doctor's orders and that he was unwilling to perform call duty. On April 20, 2012, OFC terminated appellant's employment.

The district court dismissed some of appellant's claims at summary judgment. Other claims were tried to a jury, and some claims were simultaneously tried to the court. After jury verdict, and on October 23, 2014, the district court entered final judgment. The following day, appellant filed his notice of appeal. On October 31, 2014, the district court issued an order concerning costs and disbursements, concluding that neither party was a prevailing party. On December 15, 2014, OFC filed its notice of related appeal.

---

[6] The record contains conflicting evidence concerning the date on which appellant was placed on leave. In his February 21, 2012 Charge of Discrimination, filed with the Minnesota Department of Human Rights, appellant alleged that he was placed on unpaid leave on "approximately February 26, 2011." According to OFC's corporate records, the clinic's executive committee made the decision to place appellant on leave on February 24, 2011. In their appellate briefs, both parties refer to February 26, 2011 as the date on which appellant was placed on unpaid leave.

**D E C I S I O N**

## I.     Summary judgment for OFC on claim of breach of RSPA

Appellant argues that the district court erred in granting summary judgment for OFC on appellant's claim that OFC breached the RSPA.  Specifically, appellant argues that the district court inappropriately weighed evidence in summarily dismissing his breach of contract claim.

Summary judgment is appropriately granted when the record demonstrates "that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law."  Minn. R. Civ. P. 56.03.  Appellate courts review a district court's grant of summary judgment de novo, determining whether there are genuine issues of material fact and whether the district court erred in applying the law.  *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 627 (Minn. 2012).  We view "evidence in the light most favorable to the party against whom summary judgment was granted."  *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002).

"Absent ambiguity, the interpretation of a contract is a question of law."  *Roemhildt v. Kristall Dev., Inc.*, 798 N.W.2d 371, 373 (Minn. App. 2011), *review denied* (Minn. July 19, 2011).  "The plain and ordinary meaning of the contract language controls, unless the language is ambiguous."  *Bus. Bank v. Hanson*, 769 N.W.2d 285, 288 (Minn. 2009).

"Parol evidence is admissible when the written agreement is incomplete or ambiguous" or to "explain the parties' conduct subsequent to the written agreement."

*H.J. Kramer Plumbing & Heating, Inc. v. Scharmer*, 386 N.W.2d 742, 746-47 (Minn. App. 1986) (quotation omitted). In *Scharmer*, we concluded that the district court properly determined that the contract between the parties "contained a latent ambiguity" that rendered the term "Item No. 31 Sewage Disposal System" incomplete. *Id.* at 747. The incomplete term was completed by parol evidence demonstrating what the parties understood the term to mean. *Id.*; *see also Alexander v. Holmberg*, 410 N.W.2d 900, 901 (Minn. App. 1987) (citing *Scharmer* for the proposition that courts may consider parol evidence to explain conduct of the parties subsequent to the formation of the contract but inconsistent with the terms of the contract). "The test for the admissibility of parol evidence for custom and trade is not whether a term is ambiguous, but rather, whether the proffered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Apple Valley Red-E-Mix, Inc. v. Mills-Winfield Eng'g Sales, Inc.*, 436 N.W.2d 121, 124 (Minn. App. 1989), *review denied* (Minn. Apr. 26, 1989) (quotation omitted).

The RSPA in this case directs the valuation of shares upon buyout. The RSPA states that "the purchase price [of a shareholder's buyout] shall be the average of the adjusted book values" for a fiscal year. The RSPA provides that the book value of "assets with an original cost of $100,000 or more shall be valued at the fair market value" as determined by OFC, and also provides that "[i]n the event that the adjusted book value of [OFC] is one hundred dollars ($100.00) or less per share, the purchase price of each share of Corporation Stock to be purchased shall be stipulated at One Hundred ($100.00) Dollars for a total purchase price of $5,906.00." Appellant argues that the value of

OFC's "ancillary services" should be included in computing the book value of the shares,[7] and that including the book value of "ancillary services" makes appellant's shares worth $1,850,000. OFC argues that these "ancillary services" are limited liability companies not reported on OFC's balance sheets and not properly included in computing "adjusted book values." Earlier buyouts of OFC shareholders did not include these "ancillary services" in book-value calculations.

The district court granted OFC's motion for summary judgment, relying on *Leslie v. Minneapolis Teachers Ret. Fund Ass'n*, 218 Minn. 369, 373-74, 16 N.W.2d 313, 315-16 (1944). In *Leslie*, the supreme court stated that extrinsic parol evidence is admissible to clarify an ambiguous term in a contract and "resort may be had to extrinsic evidence, [presenting the court with] . . . a question of fact, unless such evidence is conclusive." *Id.* at 374, 16 N.W.2d at 315. But the supreme court also concluded that "where parties to a contract have given it a practical construction by their conduct . . . such construction may be considered by the court in determining its meaning and in ascertaining the mutual intent of the parties." *Id.* at 374, 16 N.W.2d at 315-16; *see also J.J. Brooksbank Co., Inc. v. Budget Rent-A-Car Corp.*, 337 N.W.2d 372, 376 (Minn. 1983) (stating that the conduct of the parties "during the course of performance . . . [that] may support *inferences* as to the meaning of language in the contract, or as to their intentions with respect to gaps or omissions in the contract" can support practical construction of a contract (quotation omitted)).

---

[7] The "ancillary services" included Mankato Surgical Center, Rehab One, and MRI Mankato. The OFC shareholders receive profits from these entities, with the distributions to shareholders in 2012 having totaled $6,921,728.

7

The district court determined that the RSPA valuation provision "[t]aken as a whole . . . is not ambiguous." In its analysis of the evidence concerning the parties' conduct and their understanding of the RSPA, it noted that appellant's "acceptance of the terms of other transfers of stock [at the price OFC paid for appellant's shares] . . . is compelling evidence of how the parties interpreted a possibly ambiguous term in the RSPA." It also stated that "[a]lthough the term 'asset' may be ambiguous, there is no issue of material fact as to how the parties understood the contract and the right of shareholders under the RSPA."

Appellant argues that the district court erred in relying on evidence of the parties' conduct to determine the buyout amount under the RSPA without explicitly concluding that the term "assets" is ambiguous. Appellant also argues that, if the contract is ambiguous, then the district court should have either construed the agreement against the drafter, which he asserts is OFC, or that the district court should have concluded that there was a genuine issue of material fact and denied OFC's motion for summary judgment.

The term "assets" is not defined by the contract. Because it is undefined, the district court properly considered parol evidence to resolve the parties' disagreement concerning its meaning. *See Scharmer*, 386 N.W.2d at 747. And because the parol evidence of the previous shareholder buyouts clearly demonstrates that the parties have consistently construed the term "assets" in the RSPA as valuing shareholder's shares at $5,906, the district court did not err in concluding there was no fact question for resolution by a jury. When parol evidence "is conclusive and undisputed and renders the

8

meaning of the contract clear, its construction again becomes a question of law for the court." *Leslie*, 218 Minn. at 374, 16 N.W.2d at 316. It is undisputed that the buyouts for two other recently outgoing shareholders under the RSPA were $5,906.[8] We conclude that the district court did not err in granting summary judgment in favor of OFC concerning the valuation of OFC's buyout of appellant's shares at $5,906.

## II.     Implied covenant of good faith and fair dealing

Appellant challenges the district court's grant of summary judgment for OFC on appellant's claim for breach of the implied covenant of good faith and fair dealing under the RSPA. Appellant's claim for breach of the implied covenant of good faith and fair dealing is premised exclusively on appellant's argument that the district court erred in summarily dismissing his claim for breach of the RSPA.

All contracts in Minnesota include "an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quotation omitted); *but see Lee v. Metro. Airport Comm'n*, 428 N.W.2d 815, 822 (Minn. App. 1988) (stating that this implied covenant does not apply to employment contracts). This implied covenant "does not extend to actions beyond the scope of the underlying contract." *Hennepin Cty.*, 540 N.W.2d at 503. There need not be

---

[8] Appellant asserts that he expressed concern over one of these buyouts, claiming his disagreement as proof that he never believed $5,906 to be the proper shareholder buyout price under the RSPA. This argument is self-serving and the record reveals no evidence of any litigation or real dispute about the buyout price for these former shareholders. Whether the RSPA was "fair" is not the issue on appeal; the issue before us is whether the district court erred in concluding that, as a matter of law, the RSPA valued appellant's shares at $5,906.

a breach of contract claim in order for a party to assert breach of the implied covenant.[9]
*Id.* The party alleging breach of the implied covenant "must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 (Minn. App. 2004).

The district court concluded that OFC did not breach the RSPA, and therefore did not breach the implied covenant of good faith and fair dealing, stating that "OFC had no duty to act any differently than they did and, therefore, a breach of an implied covenant of good faith and fair dealing fails." Because we conclude that the district court did not err in granting summary judgment for OFC concerning the valuation of appellant's shares, and because appellant makes no additional argument concerning breach of the implied covenant of good faith and fair dealing under the RSPA, we conclude that the district court did not err in granting summary judgment for OFC on appellant's claim of breach of the covenant of good faith and fair dealing.

## III. Dismissal of statutory claim for unfairly prejudicial conduct

Appellant next argues that the district court erred in granting summary judgment for OFC on appellant's claim for a statutory fair-value buyout and other equitable relief under Minn. Stat. § 302A.751, subds. 1-3a (2012).

---

[9] "A breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of the contract." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). "The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Id.* (quotation omitted).

As previously discussed, we review a district court's grant of summary judgment de novo, determining whether there are genuine issues of material fact and whether the district court erred in applying the law. *Mattson Ridge*, 824 N.W.2d at 627.

A court may grant equitable relief to a shareholder when "directors or those in control of the corporation have acted in a manner unfairly prejudicial toward one or more shareholders in their capacities as shareholders or directors." Minn. Stat. § 302A.751, subd. 1(b)(3). Unfairly prejudicial conduct is "conduct that frustrates the reasonable expectations of all shareholders." *Gunderson v. All. of Comput. Prof'ls, Inc.*, 628 N.W.2d 173, 184 (Minn. App. 2001), *review granted* (Minn. July 24, 2001), *appeal dismissed* (Minn. Aug. 17, 2001). "Whether a shareholder's reasonable expectations have been frustrated is a question of fact. *Id.* at 186. We review a district court's summary denial of equitable relief de novo. *Brown v. Lee*, 859 N.W.2d 836, 839 (Minn. App. 2015) *review denied* (Minn. May 19, 2015).

The district court summarily denied appellant's motion for a fair-value buyout and for equitable relief on grounds of unfairly prejudicial conduct. The district court reasoned that, because it dismissed appellant's claim that OFC breached the RSPA by tendering $5,906 to appellant as the purchase price of his OFC shares, OFC did not act in a manner unfairly prejudicial to appellant. It therefore concluded that OFC did not unfairly frustrate appellant's expectations as a shareholder.

On appeal, appellant argues that the district court erred in dismissing his claim for a statutory buyout "solely" based on its dismissal of the RSPA breach count. Appellant argues that there are "numerous incidents of unfairly prejudicial conduct by OFC" and

11

points to a broad range of actions and conduct by OFC, and individual employees and shareholders of OFC, to support this claim, citing "bullying and ostracism" and employment actions such as forced unpaid leave, withholding compensation, and breaching his employment and deferred compensation agreements.

Appellant fails to identify how this alleged "bullying and ostracism" frustrated his reasonable expectations *in his capacity as a shareholder or director*. *See* Minn. Stat. § 302A.751, subd. 1(b)(3); *Gunderson*, 628 N.W.2d at 184 (stating that unfairly prejudicial conduct is conduct that "frustrates the reasonable expectations" of a shareholder "in their capacity as shareholders or directors"). Because appellant identifies no connection between the alleged "bullying and ostracism" and his shareholder rights, and because we conclude that the district court properly determined the valuation of appellant's shares, as discussed above, we conclude that appellant has not produced evidence sufficient to demonstrate unfairly prejudicial conduct that frustrated his reasonable expectations as a shareholder or director.[10]

## IV. Intentional infliction of emotional distress claim

Appellant argues that the district court erred in summarily dismissing his claim for intentional infliction of emotional distress (IIED) because it erroneously concluded that

---

[10] Appellant also argues that the district court considered this conduct for purposes of his reprisal claim, but did not consider it under the statutory-buyout claim. Again, appellant argues that acts of "bullying and ostracism" create genuine issues of material fact concerning whether OFC engaged in a "freeze out" of appellant, but appellant does not articulate how bullying or ostracism by his fellow doctors affected or prejudiced his rights as a shareholder or director.

12

IIED is preempted by the Minnesota Human Rights Act (MHRA) and that the complained-of conduct was not "extreme and outrageous."

We again review the district court's grant of summary judgment de novo, determining whether there are genuine issues of material fact and whether the district court erred in applying the law. *Mattson Ridge*, 824 N.W.2d at 627. We view the "evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs.*, 644 N.W.2d at 76-77.

IIED has four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983)). The party alleging IIED has "a high threshold standard of proof . . . [to meet] to submit the claim to the jury." *Id.* If a party fails to meet one element, a court "need not consider each element." *Id.* at 865.

For conduct to be "extreme and outrageous," it must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community" and "must lead an average member of the community to exclaim 'Outrageous!'" *Id.* (quotation omitted). In *Langeslag*, the supreme court concluded that a former employee's actions against her supervisor were not, as a matter of law, extreme and outrageous. *Id.* at 865-68. The complained-of behavior included two false reports to police concerning her supervisor, frequent shouting, use of vulgar language and name-calling, and "invad[ing] his personal space." *Id.* The supreme court characterized the

behavior in *Langeslag* as "bizarre, unprofessional, and more than an everyday workplace argument," but held that a successful IIED claim requires more extreme conduct than was present in that case. *Id.* at 868.

Here, appellant describes "bullying and ostracism" by his colleagues at OFC consisting of isolating behavior, insensitive comments, and hostile and unpleasant conversations. Appellant sued OFC in 2009 and continued to work there until his termination in 2012. It is hardly surprising that relationships were strained, but the complained-of behavior is not of the sort recognized as sufficiently extreme and outrageous to support an IIED claim. Unpleasantness and insensitivity of this sort is simply not outrageous or atrocious. Because appellant has failed to present evidence sufficient to demonstrate the first element of IIED, we conclude that the district court did not err in granting summary judgment for OFC on this claim. *See Langeslag*, 664 N.W.2d at 865 (explaining that if a party fails to meet one element, we "need not consider each element").

Because we conclude that appellant has not proved that the complained-of conduct is sufficiently extreme and outrageous, we need not address the question of whether the MHRA preempts appellant's IIED claim.

## V. Reprisal claims

Appellant argues that the district court erred in granting partial summary judgment for OFC concerning his reprisal claim. Appellant argues that the district court incorrectly determined the period of limitations and erroneously excluded consideration of evidence of conduct occurring before February 26, 2011 and after February 21, 2012.

14

*A. Summary Judgment*

Appellant argues that the district court erred in granting partial summary judgment and limiting appellant's reprisal claim to actions occurring on or after February 23, 2011.[11] Appellant argues that OFC's alleged reprisal should have been analyzed under the continuing-violations doctrine.

We again review the district court's grant of summary judgment de novo, determining whether there are genuine issues of material fact and whether the district court erred in applying the law. *Mattson Ridge*, 824 N.W.2d at 627. We view the "evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs.*, 644 N.W.2d at 76-77.

Claims under the MHRA must be brought within one year of the alleged unfair discriminatory act. Minn. Stat. § 363A.28, subd. 3 (2012). However, the continuing-violations doctrine creates an exception for an "unlawful employment practice [that] manifests itself over time, rather than as a series of discrete acts." *Giuliani v. Stuart Corp.*, 512 N.W.2d 589, 595 (Minn. App. 1994) (quotation omitted). The continuing-violations doctrine applies "when the discriminatory acts of an employer over a period of time indicate a systematic repetition of the same policy and constitute a sufficiently

_____

[11] As discussed in footnote 6 *supra*, appellant's February 21, 2012 MHRA claim alleged that his having been placed on unpaid leave on "approximately February 26, 2011" was an act of discrimination based on disability. The district court, in its summary-judgment analysis, adopted appellant's claimed date of having been placed on leave. But in its in limine order, the district court allowed evidence to be admitted at trial concerning the letter of February 23, 2011 from appellant's doctor identifying "medical conditions which preclude [appellant] from performing call duties," and the events after that letter culminating in the indefinite leave.

15

integrated pattern to form, in effect, a single discriminatory act." *Hubbard*, 330 N.W.2d at 440-41, n.11.

"To establish a continuing violation, [appellant] must show that at least one incident of harassment occurred within the limitations period." *Giuliani*, 512 N.W.2d at 595. Minnesota courts look to federal courts' interpretations of Title VII and give "strong weight" to these interpretations because the MHRA was modeled on Title VII. *Correll v. Distinctive Dental Servs., P.A.*, 594 N.W.2d 222, 226 (Minn. App. 1999), *rev'd on other grounds*, 607 N.W.2d 440 (Minn. 2000). Under federal law, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072 (2002). Termination is a discrete act. *Id.* at 114, 122 S. Ct. 2073.

The district court, in granting summary judgment, concluded that appellant's termination (which, by all accounts, occurred on April 20, 2012) was a discrete act, and could not be part of a continuing violation. It therefore dismissed appellant's retaliatory-termination claim. On appeal, appellant argues:

> But the court misapplied this case law as *Morgan* only applied to discrete acts of discrimination that occurred *prior* to the limitation period, and here, Appellant's termination was subsequent to the limitation period and is therefore not time-barred. *Wedow v. City of Kansas City, MO*, 442 F.3d 661, 673-75 (8th Cir. 2006) (concluding that "reasonably related" subsequent acts were timely brought when the administrative charges stated that the specific acts of retaliation were "ongoing and continuing").

16

*Wedow* applies when acts are "ongoing and continuing." *Id.* at 674. But *Morgan* explicitly states that termination is a discrete act, *Morgan*, 536 U.S. at 114, 122 S. Ct. 2073, and *Wedow* indicates that the Eighth Circuit has "recognized that retaliation claims are not reasonably related to underlying discrimination claims." 442 F.3d at 673 (quotation omitted). And appellant filed no separate Charge of Discrimination concerning his April 20, 2012 termination. Neither did he amend his complaint, originally served in 2009, within one year of his termination as to allege that his termination was motivated by retaliation for his discrimination claim. On appeal, appellant provides no apposite legal support for a determination that the district court erred in granting summary judgment for OFC on these facts. We conclude that the district court did not err in granting partial summary judgment for OFC on appellant's retaliatory-termination claim.

### B. Evidentiary Claims

Appellant argues that the district court erred in granting, in part, OFC's motion in limine to limit evidence at trial concerning alleged acts of reprisal to conduct occurring between February 23, 2011 and February 21, 2012.

A district court's evidentiary rulings will generally not be reversed absent a clear abuse of discretion. *State v. Flores*, 595 N.W.2d 860, 865 (Minn. 1999). "A district court abuses its discretion when it bases its conclusions on an erroneous view of the law." *Miller v. Lankow*, 801 N.W.2d 120, 127 (Minn. 2011). An erroneous evidentiary ruling requires reversal when we conclude that an appellant has demonstrated "a reasonable possibility that the verdict might have been different if the evidence had been admitted."

*State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994). "On appeal, the appellant has the burden of establishing that the trial court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

Appellant argues that *Kalia v. St. Cloud State Univ.*, 539 N.W.2d 828 (Minn. App. 1995), is "strikingly similar" to this case and supports his claim that the district court erroneously applied the law in excluding evidence of allegedly discriminatory actions outside the timeframe stated in the in limine order. In *Kalia*, we observed that the statute of limitations should not be the sole bar for admitting evidence of discriminatory actions, stating that the statute of limitations bar "does not refer to evidence and, like other statutes of limitations, does not bar evidence relevant to a timely filed claim, especially otherwise admissible evidence that would assist a fact-finder in ascertaining the truth." 593 N.W.2d at 833. We noted that evidence outside the period of limitations may be admissible for some purposes, such as establishing actionable conduct like malice, as well as establishing continuing violations or a pattern and practice of discrimination. *Id.* at 833-34. In *Kalia*, we stated that we were "concerned that the conditional granting of summary judgment so as to exclude the information leading up to this 'peak' [of discriminatory conduct] would be an undue restriction of the evidence." *Id.* at 835. We further stated that "[w]here a continuing violation exists, the Minnesota Supreme Court has held that evidence of these claims is not necessarily restricted to the statute of limitations period." *Id.*

*Kalia* is distinguishable. Here, the district court properly concluded that the continuing-violations doctrine did not apply. *Kalia* does not *require* a district court to

18

admit evidence outside of the period of limitations. *Kalia* held that, in the circumstances of that case, "evidence of discriminatory acts that occurred outside the period specified in the order for partial summary judgment may be probative of the intent of [the respondent] in performing acts claimed to constitute discrimination." *Id.*

The district court here explicitly stated in its in limine order that appellant's "medical conditions prior to the date he requested a reasonable accommodation are relevant to his reprisal claim" but that "[t]he question is whether [appellant] engaged in a statutorily protected activity (requesting an accommodation) and whether [OFC] retaliated against him for that action. Accordingly, the OFC's acts prior to the date of his [request for accommodation] are irrelevant."

The district court properly analyzed whether actions taken by OFC before the statutorily-protected action would be relevant to whether OFC retaliated against appellant *after* he requested an accommodation. The district court conducted a claim-specific analysis. And, having properly concluded that this was not a continuing-violations case, the district court acted within its discretion in limiting evidence of reprisal to OFC actions after appellant requested a reasonable accommodation.

## VI. Evidentiary ruling on expert testimony

Appellant next challenges the district court's grant of OFC's motion in limine to exclude Dr. Gary Namie's testimony concerning workplace bullying.

A district court's evidentiary rulings will generally not be reversed absent a clear abuse of discretion. *Flores*, 595 N.W.2d at 865. An erroneous evidentiary ruling requires reversal when we conclude that an appellant has demonstrated "a reasonable

19

possibility that the verdict might have been different if the evidence had been admitted." *Post*, 512 N.W.2d at 102. Appellant must prove that he was prejudiced by the district court's erroneous ruling. *Amos*, 658 N.W.2d at 203.

Appellant sought to introduce testimony from Dr. Gary Namie, a psychologist who appellant asserts "is widely regarded as the nation's expert on workplace harassment and bullying," to support his claim for reprisal. Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" if the expert is qualified, and the opinion has foundational reliability. Minn. R. Evid. 702. Additionally, "if the opinion or evidence involves [a] novel scientific theory, the proponent must establish that the underlying scientific evidence is generally accepted in the relevant scientific community." *Id.* We review a district court's determination concerning the foundational reliability of expert testimony and the expert's "qualifications and helpfulness" for an abuse of discretion. *Goeb v. Tharaldson*, 615 N.W.2d 800, 815 (Minn. 2000).

The district court concluded that Dr. Namie's testimony would not be "helpful to the trier of fact."[12] The district court determined that workplace bullying "is not a new or novel concept" and it is "not beyond the understanding of a trier of fact." Appellant argued to the district court, and maintains on appeal, that workplace bullying is similar to battered-woman syndrome. *See State v. Hennum*, 441 N.W.2d 793, 798 (Minn. 1989) (stating that evidence concerning battered-woman syndrome is generally admissible "since it would help explain a phenomenon not within the understanding of an ordinary

---

[12] This claim was tried to the district court.

lay person"). The district court disagreed. On appeal, appellant argues that workplace bullying is similar to battered-woman syndrome, rape-victim behavior and post-traumatic-stress disorder (PTSD).[13] *See State v. Obeta*, 796 N.W.2d 282, 294 (Minn. 2011) (holding that the "district court has discretion to admit expert-opinion evidence" concerning the "typicality of delayed reporting, lack of physical injuries, and submissive conduct by sexual-assault victims").

Rape, and battered-woman syndrome involve significantly traumatic experiences not generally experienced or understood by "an ordinary lay person." *Hennum*, 441 N.W.2d at 798; *see also Obeta*, 796 N.W.2d at 294 (discussing rape-victim responses). Those types of cases frequently involve counter-intuitive behaviors in response to traumatic experiences. *See Hennum*, 441 N.W.2d at 798 (stating that behavior of domestic violence victims may not, generally, be "within the understanding of an ordinary lay person"); *Obeta*, 796 N.W.2d at 294 (explaining delayed reporting and submissive conduct are typical for sexual-assault victims). Bullying, on the other hand, is regrettably more commonplace. As the district court aptly observed in its memorandum

---

[13] Appellant cites *State v. Sanford*, No. A07-1402, 2008 WL 4776713 (Minn. App. Nov. 4, 2008), to support his argument that Dr. Namie's testimony would have provided an alternative explanation for *OFC's* behavior—i.e. that OFC's behavior was workplace bullying. In *Sanford*, we held that the district court abused its discretion when it prohibited the defendant from presenting an alternative explanation for her erratic behavior. 2008 WL 4776713, at *3. *Sanford* does not change our analysis here. First, it is an unpublished opinion and therefore not precedential. Minn. Stat. § 480A.08, subd. 3 (2014). Second, the analysis in *Sanford* does not deviate from the ordinary abuse of discretion analysis applied *infra* to appellant's workplace bullying evidence—as did *Hennum* for battered-woman syndrome and *Obeta* for rape-victim behavior. We therefore do not address appellant's comparison to PTSD evidence and workplace bullying evidence in our analysis.

supporting its in limine order, bullying is "quite prevalent today and it is not beyond a trier of fact's ability to understand the sometimes extreme and physical manifestations that bullying can cause in an individual." We see no clear abuse of the district court's discretion in excluding Dr. Namie's proposed testimony.

## VII. Prevailing party order

Appellant argues that the district court erred in determining that neither party was the prevailing party. OFC argues that this issue is not properly before us, because appellant filed his notice of appeal before the district court entered the prevailing-party order and appellant did not move to amend his appeal to include the prevailing-party order.

"An appeal shall be made by filing a notice of appeal with the clerk of the appellate courts . . . [and] shall contain . . . a statement specifying the judgment or order from which the appeal is taken." Minn. R. Civ. App. P. 103.01, subd. 1(a). Parties have 60 days to appeal from a judgment. Minn. R. Civ. App. P. 104.01, subd. 1. We "may review any order involving the merits or affecting the judgment." Minn. R. Civ. App. P. 103.04.

On October 23, 2014, the district court entered final judgment. The following day, appellant filed his notice of appeal with this court. One week later, on October 31, 2014, the district court issued an order concerning costs and disbursements, concluding that neither party was a prevailing party. Appellant did not move this court to construe this appeal as including the October 31, 2014 order and judgment. Neither party appealed

22

from the October 31, 2014 judgment.  Issues raised by the October 31, 2014 judgment are therefore not properly before us.

## VIII.  Resolution of ancillary-payments issue

On cross-appeal, OFC argues that the district court erred by allowing the question of whether ancillary payments were "compensation" under the employment agreement to go to the jury.  OFC argues that the district court should have granted OFC's motion for summary judgment, and it urges us to reverse the district court's denial of summary judgment or, alternatively, to reverse the district court's denial of its motion for JMOL.

### A.  *Scope of appellate review*

OFC maintains that "[t]he Employment Agreement's interpretation was not, and could not have been, presented to the jury for determination" and that we should review the district court's denial of summary judgment because the district court *should have* determined, as a matter of law, that there was no question of fact for the jury.  Appellant argues that the district court explicitly and clearly found genuine issues of material fact for resolution by the jury and its denial of summary judgment is not reviewable on appeal because the issue was tried to a jury.

Except in cases where summary judgment is denied based on an issue of law, denial of summary judgment "is not properly within the scope of review on appeal from the judgment," and when the case is appealed after being tried to a jury that reached a verdict, "we will not consider it".  *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 918-19 (Minn. 2009).

23

The district court denied summary judgment based on its determination that "whether [appellant] was entitled to ancillary payment[s] as compensation during his disability leave" was a "question of material fact." Under *Bahr*, the question on appeal is whether summary judgment was denied based on a question of fact or law, and, if it was denied on account of a genuine issue of material fact, denial of the motion is not properly reviewable on appeal. *Id.* Our inquiry into whether the district court *correctly* determined there was a genuine issue of material fact is limited. *Id.* The supreme court explained that "[t]his is because the district court's conclusion at the summary judgment stage that there was a genuine dispute of fact becomes moot once the jury reaches a verdict on that issue." *Id.* at 918.

We conclude that this aspect of the district court's summary judgment order is not within the scope of our review on appeal. We also observe that OFC is not materially prejudiced because the "standards for granting summary judgment and for granting judgment as a matter of law are the same." *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 545 n.9 (Minn. 2001).

### B. Admission of evidence of disability payments

OFC argues that appellant "never produced the evidence" that he was due ancillary payments during his disability leave and that the district court erred in denying its motion for JMOL. OFC also argues that the district court erroneously excluded evidence at trial. Appellant responds that OFC has not disputed the sufficiency of the evidence supporting the jury's award or findings and, because it did not object to the jury instructions which establish the law of the case, we should affirm the verdict.

24

*1. Judgment as a matter of law*

JMOL is appropriate "only in those unequivocal cases where (1) in the light of the evidence as a whole, it would clearly be the duty of the [district] court to set aside a contrary verdict as being manifestly against the entire evidence, or where (2) it would be contrary to the law applicable to the case." *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn. 2006) (quotation omitted); *see also* Minn. R. Civ. P. 50.01(a). "If reasonable jurors could differ on the conclusions to be drawn from the record, judgment as a matter of law is not appropriate." *Bahr*, 766 N.W.2d at 919.

Appellate courts review de novo a district court's denial of a motion for JMOL. *Id.* On review, we "view the evidence in the light most favorable to the prevailing party." *Id.* Since appellant prevailed on this issue, we review the evidence in the light most favorable to him.

Appellant correctly posits that, because OFC did not challenge the district court's jury instructions, and therefore did not challenge the law provided to the jury, the jury instructions are the law of the case. *See Wolner v. Mahaska Indus., Inc.*, 325 N.W.2d 39, 42 (Minn. 1982) ("Where a party makes no objections to jury instructions before the jury retires, and does not specify fundamental errors in a motion for a new trial, the instructions are the law of the case and may not be challenged for the first time on appeal."); *Jones v. Amoco Oil Co.*, 483 N.W.2d 718, 724 (Minn. App. 1992) (interpreting *Wolner* to hold that unchallenged jury instructions are law of the case and cannot be challenged on appeal), *review denied* (Minn. May 15, 1992).

25

The unchallenged jury instructions were that the jury should determine "whether there was an [employment] agreement" and that it could "consider all the circumstances" in making its determination. The jury heard testimony concerning the OFC compensation practices, including the three components of compensation used by OFC: base salary, production pay, and ancillary payments. There was ample evidence, as the district court noted in its order denying OFC's motion for JMOL, that the parties understood "compensation" to include these three components and that "ancillary pay, though not specifically articulated in the employment agreement, . . . was contemplated by the employment agreement, just as base and production pay were considered compensation under the employment agreement." Moreover, OFC's counsel conceded during arguments at the post-trial motion hearing that a jury could find that ancillary payments are compensation under the employment agreement.

While OFC does not now agree with the district court's instructions to the jury that it could consider all relevant evidence and circumstances in determining the compensation due to appellant for OFC's employment-contract breach, OFC did not timely object to those instructions. Viewing the evidence in the light most favorable to the verdict, the record supports the jury's conclusion that the parties understood compensation under the employment agreement to include base salary, production pay, and ancillary payments, and that OFC breached the employment agreement by failing to fully compensate appellant during his leave.

## 2. *Evidentiary rulings*

OFC also challenges the district court's evidentiary ruling at trial excluding a letter from appellant's disability insurer in which appellant represented that he was disabled. OFC argues that the district court improperly allowed appellant to testify that he was not disabled and wanted to work during periods of time when he was collecting disability-insurance benefits.

Our standard of review of evidentiary rulings is for abuse of discretion and the party challenging the ruling must demonstrate not only error, but *prejudicial* error. *Amos*, 658 N.W.2d at 203. We review decisions on motions for JMOL de novo. *Bahr*, 766 N.W.2d at 919.

The district court granted appellant's motion in limine to exclude evidence of collateral source payments to appellant and references to information concerning insurance or disability coverage, except for impeachment purposes. OFC argues that it sought to impeach appellant's testimony that he wanted to work and was not disabled with a letter from appellant's disability insurer indicating that appellant had represented to the insurer that he was disabled. Appellant argues that "disability" under the employment agreement was different than the definition provided by the disability insurance contract and that the two terms have different meanings in different contexts. The district court determined that:

> There is a question of fact, however, as to whether [appellant] was on disability leave under section 4.1 of the employment agreement. While the Court ruled that [appellant] was not qualified to work as an orthopedic surgeon pursuant to the definition of "disabled" under the MHRA, this does not

27

necessarily mean that [appellant] was "disabled" under the employment contract. Likewise, the definition of "disabled" under the insurance contract was different than the definition under the MHRA. The Employment Agreement does not define "disabled," as such, there is a question of fact as to whether [appellant] was disabled under section 4.1 of the contract. Accordingly, evidence of [appellant's] disability, or non-disability, may be introduced for this purpose.

The district court properly identified that "disability" can mean different things in different contexts. In its discretion, the district court carefully circumscribed the use to which correspondence referring to appellant's disability for insurance purposes could be put at trial. We conclude that the district court properly identified the fact question for resolution by the jury—whether appellant was disabled under the employment contract— and acted within its discretion in excluding evidence from the disability insurer stating that appellant was "disabled" for other purposes.

## IX. Collateral-source offset

The district court computed and applied a collateral-source offset under Minn. Stat. § 548.251 (2012) for disability insurance benefits received by appellant from Lincoln Financial Group. Appellant was paid $353,991.20 for the period from May 27, 2011 until May 27, 2013. The jury found damages of $982,366 for the period from May 15, 2011 until July 20, 2012. The district court concluded that "the pro rata amount of the insurance payment" for the period for which the jury found damages was $217,917, and reduced that amount by the $40,014 of attorney fees incurred by appellant to recover the disability benefits, resulting in a net collateral-source offset of $177,903.

OFC challenges this calculation, arguing that the district court erred in making the pro rata calculation and in offsetting appellant's attorney fees incurred in obtaining the disability judgment from his insurer.

The question of whether the district court properly determined the collateral-source offset here depends upon the interpretation of Minn. Stat. § 548.251 (2012). We review the district court's interpretation of a statute de novo. *Graff v. Robert M. Swendra Agency, Inc.*, 800 N.W.2d 112, 120 (Minn. 2011).

A judgment must be offset by collateral sources, such as disability insurance payments, Minn. Stat. § 548.251, subd. 1(2), when "liability is admitted or is determined by the trier of fact, and when damages include an award to compensate the plaintiff for losses available to the date of the verdict by collateral sources." *Id.*, subd. 2. "The primary purpose of the collateral source statute is to prevent double recoveries by plaintiffs." *Graff*, 800 N.W.2d at 120 (quotation omitted). The statute "abrogates the common law, [and therefore] we construe the statute narrowly." *Id.* But "our rules of statutory interpretation require us to construe statutes to avoid unjust consequences." *Id.* at 121 (quotations omitted). *Graff* holds that an award of attorney fees is not properly offset as a collateral source. *See id.* ("We conclude that the attorney fees paid to Graff's counsel as part of the workers' compensation settlements do not constitute payments related to Graff's 'injury or disability' resulting from the August 2004 motor vehicle accident.").

OFC asserts that the statute, which it argues should be strictly construed, can only offset an award "pursuant to the provision listed in the statute," *id.*, and the statute does

not specifically authorize a pro rata reduction, *see* Minn. Stat. § 548.251. Therefore, it argues, the district court erred by offsetting appellant's judgment by "the pro rata amount of the insurance payment that would have been allocated to the jury verdict time period," which was $217,917. Appellant argues in response that the district court appropriately limited the offset to avoid "a potential double recovery." (Quotation marks omitted).

The statute does not explicitly instruct a district court concerning whether, or how, to apportion and reduce an award when the amount awarded does not precisely match the amount obtained from a collateral source (here, disability insurance). *See* Minn. Stat. § 548.251, subd. 2. In a case where a prevailing personal-injury plaintiff recovers past medical expenses and those expenses have already been paid by a health insurer, Minn. Stat. § 548.251 operates to relieve the liable personal-injury defendant from liability for medical expenses that have been previously paid by health insurance or another collateral source, so that the plaintiff does not recover the same amount twice. *See Swanson v. Brewster*, 784 N.W.2d 264, 282 (Minn. 2010). Where the verdict and the collateral source payments do not precisely match, application of the statute becomes more complicated. For example, in *Heine*, the payment from collateral sources related to two separate accidents, one of which was not at issue during the trial. *Heine*, 702 N.W.2d at 765-66. The supreme court remanded to the district court to determine the amount of collateral source payments fairly allocated to the accident at issue at trial. *Id.* at 766-67. Here, appellant received collateral source payments for a longer period of time than was at issue at trial and the district court offset appellant's recovery by the amount fairly allocated to the time period at issue.

30

The district court observed that "[n]either party seems to dispute that the jury verdict was for 'earnings' that would have been paid to [appellant] had [OFC] not breached the contracts." It correctly observed that the monthly payment amounts paid by the insurer to appellant were calculated based on the "monthly amount [appellant] would receive under the contract."

Courts have applied Minn. Stat. § 548.251 to allow reductions to avoid double-recovery, *see Heine*, 702 N.W.2d at 766, or to avoid unjust consequences, *Graff*, 800 N.W.2d at 121. The district court here applied common sense, in light of *Graff*, to achieve the essential purpose of the collateral-source-offset statute: avoiding a double recovery while not leaving the prevailing party "undercompensated." *Heine*, 702 N.W.2d at 764 (citing *Imlay v. City of Lake Crystal*, 453 N.W.2d 326, 335 (Minn. 1990)); *see also Graft*, 700 N.W.2d at 121. The district court properly reduced the collateral-source offset by appellant's attorney fees incurred in recovering under the disability policy.

In sum, we affirm the district court's grant of summary judgment for OFC on appellant's claims for breach of the RSPA, breach of the implied covenant of good faith and fair dealing, statutory fair-value buyout and unfairly prejudicial conduct, and intentional infliction of emotional distress. We also affirm the district court's partial summary judgment on appellant's reprisal claim, and the district court's evidentiary rulings challenged by both parties. We decline to address appellant's challenges to the prevailing-party order as that issue is not properly before us. We affirm the district court's denial of OFC's motion for judgment as a matter of law on appellant's breach of

contract claim concerning the employment agreement, and affirm the district court's application of the collateral-source offset statute.

**Affirmed.**